No. 68,712

STATE OF KANSAS, *Appellee*, v. DAVID E. RAKESTRAW, *Appellant*.
(871 P.2d 1274)

Opinion filed April 15, 1994.

*Julie A. Gorenc*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, David E. Rakestraw, was convicted of the second-degree murder of Joseph D. Harrison. He appeals, claiming numerous errors, one of which causes us to reverse and remand for a new trial. In his first claim of error, the defendant contends that the court erred by admitting his redacted statements of the events that occurred on the evening Harrison was killed. We agree.

David Rakestraw and Richard Billingsley were charged with second-degree murder in the death of Harrison. Harrison was beaten to death during the early morning hours of July 16, 1991, in Wyandotte County, Kansas. He died as the result of internal bleeding that resulted from large tears in the membrane that held his small bowel in place inside his abdomen.

The defendant and Billingsley were tried together. The jury found the defendant guilty but acquitted Billingsley. The defendant presented no evidence at trial. Steve Harris, a friend of the defendant, testified at trial that he witnessed the incident. Harris initially was charged with aiding a felon because he gave a false statement to the police immediately after the incident. The charges against Harris were dropped in exchange for his testimony at trial.

Harris was the State's key witness and testified that he saw Billingsley and the defendant beat and kick the victim. He testified that the defendant threw the first punch after an exchange of words. When the victim threw the defendant on the ground, Harris testified that Billingsley got involved in the fight and the two men continued to beat Harrison even after Harrison tried to walk away and after he lay helpless on the ground.

The police responded to a report that there was a body lying in the street at the trailer court where the beating had occurred. When the responding officer saw the victim, he called for emergency medical assistance. The victim was dead when the ambulance arrived.

Harris and the defendant initially told the police that three Mexicans in a yellow car beat Harrison. Harris later told the police essentially the same information to which he testified at trial. The defendant also later changed his first story.

Detective Clyde Blood testified about the defendant's out-of-court statement concerning the fight. Blood testified that the defendant told him that the fight started when the victim swung at him and that he hit and kicked the victim. This, however, was a redacted version of the statement that the defendant actually gave to the police. The defendant's complete statement included information about Billingsley's involvement in the fight. When

Blood testified about Rakestraw's statement, however, he omitted all information from the defendant's statement relating to the co-defendant Billingsley. The redacted statement forms the basis for the defendant's first claim of error. He contends that the admission of the redacted statement distorted the truth so as to deny him a fair trial.

Billingsley presented an alibi defense. He and several witnesses testified that he was at the Kansas City Royals baseball game on the night of the beating. Billingsley testified that he knew Harrison and that Harrison was alive when he last saw him that night. He testified that when he arrived at the trailer park after leaving the game, he went to his sister's trailer with his brother-in-law to have a beer and talk about the game. His brother-in-law had only one beer, so Billingsley went outside to get a beer from Harris and the defendant. They got him a beer, and they talked for awhile. The victim, Harrison, and his friend Ron Burk, later came up and asked for a beer. Harris gave Harrison and Burk each a beer, and they sat on Burk's car drinking it. Billingsley testified he then went inside to see what his brother-in-law was doing and the next thing he remembered was waking up the next morning.

Billingsley's sister testified that when she arrived home from a movie that evening Billingsley was "passed out" in a chair. Billingsley's brother-in-law testified that Billingsley fell asleep in the chair about 30 minutes after they got home from the ball game.

Billingsley's theory at trial suggested that maybe Harris and the defendant beat Harrison and that Harris was trying to blame it on Billingsley. Billingsley's counsel elicited testimony that Harris had been friends with the defendant since they were children but had known Billingsley for only a few days before the beating. He also highlighted Harris' testimony that he did not intervene to help his good friend even when Harrison was getting the better of him in the fight. Counsel also highlighted the fact that Harris had blood on his face, shorts, shoes, and legs, noting Harris' explanation was that all of that blood had splattered on him because he was standing near the victim when Billingsley kicked the victim one time.

The defendant initially denied any involvement in the beating but then gave a statement to Detective Blood concerning his involvement and Billingsley's involvement in the beating. In his complete statement, the defendant minimizes his own actions and essentially blames Billingsley for Harrison's death. Because the first error centers upon this statement, we set forth in full the statement given by the defendant to Detective Blood.

"Q: What is your full name?

"A: David E. Rakestraw.

"Q: When and where were you born?

"A: Kansas City, Missouri I think. I'm pretty sure. 11-15-70.

"Q: Where do you live and what is your telephone number?

"A: 1911 Merriam Lane, no phone.

"Q: With whom do you live?

"A: By myself.

"Q: Where are you employed and how long have you worked there?

"A: AJM Packing Corporation, I worked there for six months. I've been hired on for three through temporary service and then I got hired by AJM for the past three months.

"Q: Have you been advised that you have the right to remain silent; that any statement you make can be used against you as evidence in court; that you have the right to the presence of an attorney, either retained by you or one appointed for you without cost and that the attorney can be present while you are being questioned?

"A: Yes.

"Q: Do you understand your rights?

"A: Yes.

"Q: And are you giving this statement voluntarily of your own free will?

"A: Yes.

"Q: David, were you involved in an altercation in Sunflower trailer park in the 1900 Block of Merriam Road?

"A: Yes.

"Q: I talked to you earlier this morning and took a statement from you. Was that a true statement?

"A: No.

"Q: Would you tell me now what happened?

"A: Yes. Well, last Saturday night this guy from the trailer court came up and started mouthing off to a friend of mine and his friends (Steve Harris and Steve was there and I don't know the other guys' names). And I guess they got in a fight. They didn't want the guy trailer park back up to the other trailer. So he came up there last night and started mouthing off to me, Steve and Rick and two other guys that was there. And, ah, they was egging

me on to fight him, kick his butt or something and I didn't want to till the night went on then I just, don't know why but I just swung at him. He threw me on the ground and I got back up a little bit madder. I hit him a couple of times and he fell on the ground and he got up and started walking off and Rick grabbed hold of him threw him on the ground kicked him in the head a couple of times and I kicked him in the ball and I suppose I kicked him in the head a couple of times. And then I kind of cooled off and wanted the guys to just go and leave him there but then Rick kept on kicking him, kicking him, kicking in the head and ah, I got started getting worried and went over to check his pulse and while I was checking his pulse to make sure he was alive Rick kept on kicking him. He was still alive and I was telling Rick to cool it off. There was this lady in the trailer court telling Rick to cool it off, we all was. And then she decided to call the ambulance something like that. We left there for a couple of minutes. I went back over there and he felt kind of cold. She called the ambulance and the police came down and I went back to my place and went ah, soaked my shirt in the sink and got on a clean t-shirt and washed up a little bit while the cops was going to come. While I was doing all this Rick went back over there was still kicking on him, he was having a good ole time on him. Took his wallet and seen if he had any money and checked his pockets and the police came and I walked over to the police car and I started telling a bunch of lies actually trying to cover for Rick cause I knew the guy was about gone. That's about it.

"Q: Who is Rick?

"A: He's a guy that lived in the trailer court I don't know what trailer he lives in. I'm pretty sure he lives there cause he's around there a lot.

"Q: Do you know his last name?

"A: No.

"Q: Describe him.

"A: He's got like three teeth missing in his right upper teeth, sandy blonde hair, about 6'1", medium built, about mid 20's . . . 25-26 something like that, moustache I think. He had on jeans and t-shirt, I didn't really notice and I think a pair of boots.

"Q: Does he have a motor vehicle?

"A: I don't think so.

"Q: Do you know if he works anywhere?

"A: No, I don't know.

"Q: Did you receive any money that was taken away from the victim?

"A: No.

"Q: Do you know how much money was taken from the victim?

"A: I think they said about $1.26, something like that.

"Q: How did Steve Harris participate in that incident?

"A: He pretty much stayed back but I wasn't paying attention to how he was acting. He just stood back.

"Q: At any time did you see Steve Harris assault the man in any way?

"A: No.

"Q: When you said that you kicked him in the balls, and in the head, did you kick him in the stomach area?

"A: No.

"Q: Did you see Rick kick him in the stomach?

"A: I don't know. He was kicking him everywhere. He was going nuts on him.

"Q: Would you estimate for me the number of times that Rick kicked him?

"A: I couldn't know really, it was so many times. He was laughing and kicking him.

"Q: Do you know if Steve received any money?

"A: I don't know.

"Q: Earlier you stated that there was a woman that was telling you all to cool it?

"A: Telling Rick to cool it.

"Q: Was this the same lady that called for the ambulance?

"A: Yes.

"Q: Were there any other people outside watching when that incident occurred?

"A: I don't think so.

"Q: How many people, all together, was there when the altercation started last night?

"A: Just me, Steve, Rick and that one guy that got beat up.

"Q: Were you wearing the same tennis shoes that you turned to Det. Deason and myself this morning?

"A: Yes.

"Q: And the t-shirt that was recovered by the property officer last night was the t-shirt you were wearing?

"A: Yes.

"Q: And you stated that you took that t-shirt off and was soaking it in the sink?

"A: Yes.

"Q: Were any weapons used other than your hands and feet?

"A: No.

"Q: Did you suffer any other injuries during the struggle?

"A: No.

"Q: Other than the scrape on your knee?

"A: Yea, that was it.

"Q: Are you aware of any injuries that Rick may have suffered in the struggle?

"A: I don't know.

"Q: Have you had contact with Rick since that incident occurred?

"A: No.

"Q: Was Rick standing around with you or in the vicinity when the police were there last night?

"A: Yes.

"Q: Are you afraid of Rick?

"A: After last night I am.
"Q: At the time this incident occurred, were you under the influence of drugs or alcoholic beverage?
"A: Yes, alcohol. We had been drinking beer.
"Q: At the time of this statement are you under the influence of drugs or alcoholic beverage?
"A: No.
"Q: Was there a white over yellow vehicle in the area at the time this incident occurred?
"A: No.
"Q: Do you know anyone who owns or operates a vehicle of that description?
"A: No.
"Q: Is there a white over yellow vehicle of any kind involved in this incident in any way?
"A: No.
"Q: Is that just a vehicle description that you worked up to throw us off track?
"A: That one vehicle that came down Saturday night and started some trouble.
"Q: Was this at another location other than your and Steve's house.
"A: Yes, some place else in the trailer park.
"Q: It didn't have anything to do with you, Steve, Rick or our victim?
"A: No.
"Q: Do you know a man named Joseph D. Harrison?
"A: No.
"Q: Do you know the name of the person you assaulted along with Rick?
"A: No.
"Q: Is there anything else you can tell us that would aid us in this investigation?
"A: No, I think that will be all."

Billingsley sought to limit the prosecution from admitting any portion of the defendant's statement concerning Billingsley's participation in the beating. He did so by a motion in limine and on the basis of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), and our adoption of the *Bruton* holding in *State v. Rodriquez*, 226 Kan. 558, 601 P.2d 686 (1979). In *Rodriquez*, we said that "[a] defendant is deprived of his rights under the confrontation clause of the Sixth Amendment to the United States Constitution where the extrajudicial statement of a non-testifying codefendant inculpating the defendant is admitted, although an instruction is given limiting the use of the statement to the codefendant." 226 Kan. 558, Syl. ¶ 1.

The trial court granted Billingsley's motion to exclude "any mention of the defendant Richard Billingsley when questioning

the detectives about the defendant David Rakestraw's statement." Before trial and at trial, Rakestraw objected to the admission of any modified version of his statement because the modified version that omitted reference to Billingsley presented an inaccurate view of the defendant's statement.

The trial court proposed to allow Detective Blood to testify that Rakestraw told him that Rakestraw "kicked him (the victim) in the balls and kicked him in the head several times." On cross-examination, Blood clarified that Rakestraw said he kicked the victim "in the balls" and in the head a couple of times but did not kick him in the stomach.

Prior to admitting this evidence, the following exchange took place between defense counsel and the court:

"THE COURT: Let me ask you this. What is your legal objection?

"MR. SUTHERLAND: By picking and choosing parts out of this statement, we're giving the jury an inaccurate description of what my client did in response to what was going on. To me he's not testifying as to what he told him. He's taking out bits and pieces of what's being told and thereby not giving the true statement that my client made. I'm assuming I can't cross-examine him on these parts of the statement because you get back into the same situation that I'm sure Mr. Duma [counsel for Billingsley] would have the same objection to me asking him about these as he would the State not being able to bring them out in the first place.

"THE COURT: I'll overrule your objection for the following reasons. The officer is giving a true statement as to what your client told him as to what your client did in relationship to the victim. It may not be giving the exact way that it happened from moment to moment because things happened intermediate to certain things he testified to. I think what your client said he did to the officer is true and correct and you have the right to cross-examine those points. You're correct, I won't let you cross-examine as to what your client said someone else did. I think you can clarify on cross-examination as to what your client did in relation to this victim.

"MR. SUTHERLAND: Your Honor, it would be our impression and we make the contention that it denies my client as part of his right not to testify, all of his statement is not being brought in. We believe it's an aberration of his original statement. It effectively denies him his right not to testify or having to testify to put in and make a corrected statement.

"THE COURT: As I understand it, the exception of the hearsay rule has to do with confessions as they arise to implication of the defendant. I think this officer is telling everything your client told him. I have no problem with that. He's not

being forced or told whether to take the stand or not. The only thing that seems unfair is that your client may not be getting the benefit of what was done—I have no problem with him saying what the victim [sic] told him."

On appeal, the defendant argues that his Sixth Amendment rights under the United States Constitution were violated because he was unable to have the jury instructed on his theory of defense, which denied him a fair trial. He contends that the redacted statement with other testimony from Harris is tantamount to an admission to second-degree murder. He claims, however, that his full statement implicates him in, at most, an aggravated battery and establishes that Billingsley killed the victim by kicking him to death.

The defendant further claims that by admitting the redacted statement, the trial court violated his Fifth and Fourteenth Amendment rights as well as his rights guaranteed by § 10 of the Kansas Constitution Bill of Rights. He contends these violations occurred because he could not present his complete statement to the jury without sacrificing his right not to incriminate himself. In other words, the defendant contends that once his partial statement was presented, the only way the whole truth could come forth was for him to testify on his own behalf.

On a related contention, the defendant claims that he did not receive effective assistance of counsel based upon counsel's failure to move for a separate trial. We need not address the above contentions in detail for there is a controlling Kansas case that requires reversal of the defendant's conviction.

In this case the trial court was duty-bound to grant Billingsley's motion in limine to exclude portions of the defendant's statement relating to him. The Sixth Amendment guarantees a defendant the right to confront the witnesses against him. Rakestraw's statement in this case implicated Billingsley. Under *Bruton* and *Rodriquez*, admission of those portions of the statement implicating Billingsley would have violated Billingley's right of confrontation if Rakestraw did not testify. Thus, the trial court was required to grant Billingsley's motion.

While .editing Rakestraw's statement to delete incriminating references to Billingsley protected Billingsley's constitutional right

to confront the witnesses against him, the redaction so changed Rakestraw's statement that it no longer represented his true statement. The trial court was of the opinion that its admission would not harm Rakestraw because it was limited to what Rakestraw actually did on the night Harrison was beaten to death. Our cases, however, require a trial judge to conduct further inquiry before admitting a redacted statement. In *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980), we held that "[t]he introduction into evidence of a defendant's redacted statement is proper *unless the redaction procedure distorts the statement.*" 228 Kan. 264, Syl. ¶ 2. (Emphasis added.)

In *Purdy*, John Purdy was convicted of first degree murder, aggravated burglary, and two counts of aggravated robbery arising out of the death of Robert Humphrey. He was tried with a co-defendant, Kenneth Hutchison, in a joint trial. The evidence at trial indicated that Purdy and Hutchison both entered Humphrey's home and both were armed with handguns. After seeing Humphrey approach him with a gun, Purdy shot and killed him, and the two defendants fled with Humphrey's wallet and his fiancee's purse.

After his arrest on another matter, Hutchison gave a voluntary statement concerning the Humphrey homicide and implicated Purdy. Purdy also gave a statement to the police. The court allowed both statements to be introduced in the joint trial, and neither defendant took the stand. Each statement was excised to prevent reference to the other defendant pursuant to the *Bruton* rule on confrontation.

Purdy argued on appeal that the excising of the statements changed the meaning to such an extent that the admission was improper and could not be cured by the limiting instruction. The trial court, when it introduced each confession, advised the jury that it could consider each confession only against the party giving the confession.

In *Purdy*, we analyzed the impact of the *Bruton* rule and considered an extensive annotation on this same subject. See Annot., 29 L. Ed. 2d 931, 991. In *Purdy*, we concluded that the admission of Hutchison's and Purdy's redacted statements was not error pur-

suant to *Bruton*. 228 Kan. at 270. Purdy's contention was much like the contention the defendant makes in this case, *viz.*, that the meaning of his own statement was substantially changed by the process of redaction. The defendant in this case complains of distortion by redaction.

In analyzing Purdy's claim, the court examined and compared the original statements and the redacted versions, concluding that "the meaning is not distorted." *Purdy* further relied upon an earlier federal case of *United States v. Kershner*, 432 F.2d 1066 (5th Cir. 1970). In *Kershner*, the defendants claimed that the court erred in admitting a "highly concentrated and out-of-context synopsis, which was not fairly representative of what he had said." 432 F.2d at 1069. The court held that unless the redaction procedure "distorts a confession, it may be used because it does not violate any constitutional right of the defendant to be confronted with the witnesses against him." 432 F.2d at 1071.

*Purdy* remains the law. It is well analyzed and provides a clear guide for us in resolving this case. As in *Purdy*, we must examine and compare the original and redacted statement. In this case, unlike *Purdy*, we conclude that the redaction procedure distorted the defendant's confession. In his complete statement to the police, Rakestraw admitted to kicking the victim a couple of times and kicking him once "in the balls." The defendant denied kicking the victim in the stomach. He denied any further involvement except trying to cool down the codefendant, Billingsley. It was Billingsley, according to Rakestraw's original statement, who kicked the victim to death. The redacted statement mentions only the defendant's actions of kicking the victim in the head and groin, but the victim died of internal abdominal injuries. In a sense, Rakestraw's complete statement is exculpatory with regard to the charged offense of second-degree murder. The redacted statement, on the other hand, is inculpatory because it presented only the defendant kicking the victim. The redacted statement, together with Harris' statement and the autopsy evidence, established the essential elements of second degree murder.

If the complete statement is exculpatory and the redacted statement is inculpatory, we must conclude that the redacted state-

ment distorts the meaning of the complete statement. Our analysis need go no further. Under the facts of this case, we conclude the admission of the redacted statement over the defendant's objection distorted the meaning of the defendant's statement. He was denied a fair trial. We reverse and remand the case for a new trial. Upon retrial, this same problem will not be present because the defendant will be tried alone.

Because this case may be tried again, we also need to discuss the defendant's contention that an accomplice instruction should have been given with regard to the testimony of the State's key witness to the beating, Steve Harris. Harris originally was charged as an accessory after the fact because he originally lied to the police about the incident, claiming that the victim was beaten up by Mexicans in a yellow car. In exchange for Harris' truthful testimony, the prosecution agreed to drop this charge.

At trial, the defendant requested an accomplice instruction, but the trial judge denied the request on the basis that being charged as an accessory would not make Harris an accomplice. Only if Harris had been charged with the same crime would he have been an accomplice. While it is true that Harris was not charged with murder, Billingsley at least implicated Harris in the beating. Although Billingsley denied witnessing the beating, he placed Harris at the scene, and his defense counsel tried to cast doubt on Harris' claim that he was not involved in the fight and was spattered with blood only while trying to render aid to the victim. Upon remand, it would be appropriate for the trial court to grant the defendant's request and give the cautionary instruction on accomplice testimony. We need not and do not decide whether the failure to give such an instruction was reversible error. We do conclude that the question is close enough for us to advise the court to give a cautionary instruction on accomplice testimony if Harris testifies at the new trial.

Reversed and remanded for new trial.