No. 79,051

STATE OF KANSAS, *Appellee,* v. JOHN MICHAEL MANARD, *Appellant.*

(978 P.2d 253)

Opinion filed April 16, 1999.

*Elizabeth Seale Cateforis,* assistant appellant defender, argued the cause and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Paul J. Morrison,* district attorney argued the cause, and *Steven J. Obermeier,* assistant district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: John Michael Manard appeals his convictions of first-degree felony murder, K.S.A. 21-3401(b), and aggravated robbery, K.S.A. 21-3427. Manard was tried jointly with codefendant Michael Yardley. See *State v. Yardley,* 267 Kan. 37, 978 P.2d 886 (1999).

Our jurisdiction is under K.S.A. 22-3601(b)(1), (a life sentence was imposed).

Manard claims the district court erred: (1) by consolidating his trial with Yardley's, (2) in admitting Manard's redacted statement, (3) by allowing the codefendant's direct examination of a police officer to go beyond the redacted version of the defendant's statement, (4) by overruling his objection to the State's alleged "gender-based strike" of a potential juror, and (5) in refusing to suppress his incriminating statements to police. Manard also alleges error concerning jury instructions, prosecutorial misconduct during closing argument, the complaint charging aggravated robbery, and double jeopardy.

Finding no reversible error, we affirm.

## FACTS

On June 13, 1996, around mid-afternoon, Manard and Yardley dropped by Michelle Zanin's mobile home in Gardner, Kansas. Darren Stevens, another acquaintance of Zanin's, arrived later. Yardley passed around a semi-automatic .45 caliber black handgun with the word "Gordy" written on the side. They all held it. Apparently Manard had given the gun to Yardley. Stevens, Yardley, and Manard were smoking marijuana. At some point, according to Stevens, "Mike [Yardley] hit his pocket one time said and I got this [the gun] we can go jack a car." Manard and Yardley were talking about a carjacking before the gun was displayed, while it was being shown around, and after it was put away. Manard and Yardley also talked about taking the stolen car to Phoenix. Stevens did not take "the guys" seriously. Stevens thought that the term "jack" implied the driver would be present. Zanin heard talk about jumping in a car at a gas station that had its keys in it. Manard and Yardley asked Zanin for a ride to Overland Park, or somewhere up north. Zanin agreed. She returned to her home after dropping them off at a Quick Trip on Shawnee Mission Parkway.

That same afternoon, Debra England and her ex-husband Donald were running errands. Debra was driving a Chrysler LeBaron convertible. Donald, who had a brain tumor, was living with Debra and their two sons. Around 6:30 p.m., Debra looked in at the Snip

N' Clip shop, saw there was no line, and decided to have her hair trimmed. Donald stayed in the car. The car windows were down, the keys were in the car, and the radio was playing.

After her trim, as Debra and the stylist Jessica Rojas, were walking to the front of the shop, Debra looked to see if Donald was okay. She saw two white males approach the rear of the LeBaron. They separated. One opened the door and sat on the driver's side. The other went to the passenger's side where Donald was seated, leaned into the window, and pointed a gun at him. Donald got out of the car. He turned around and faced the person with the gun. Debra was running out of the shop when she heard a shot. She ran up to the driver and said, "What are you doing, where are you going? You just shot someone, you are leaving?" Debra noted the driver yelling at the shooter to get in the car.

Rojas saw Donald get out of the car and it looked as if he was going to kick the shooter. The shooter got in and the car drove off, initially heading west; however, at an intersection, the LeBaron hit a car, jumped the median and headed east. In a photographic lineup one witness picked out the light-complected Manard as the driver of the automobile.

At around 7 p.m. that evening, Lorretta Wooderson was looking out the glass storm door of her home in Prairie Village. She saw a convertible slowly drive by and stop in front of her house. She did not see where the car went. When she looked out again, she saw two young men walking north in the grassy area in front of Tomahawk School. Later that evening she decided to call the police because the convertible was parked in an out-of-the-way alcove at the school. The car windows were down, nobody was around, and the car was out of place there.

During the early evening hours, before the discovery of the convertible at the school, Jeff Birdsong was outside working on his car. He was house sitting for a friend who was also a friend of Yardley's. Birdsong heard a car pull up. Yardley approached him and asked if he could use the garage. Birdsong told him no. Birdsong thought Yardley seemed "freaked out" and serious. After Birdsong refused to let Yardley use the garage, Yardley went to the passenger side of the car and got in, and the car left.

Fifteen or 20 minutes later, Yardley came back on foot with "another guy" and wanted to use the phone. Birdsong told them to go on in the house and use it. He then told the two men to leave. They were gone in 10 or 15 minutes. Birdsong did not see who picked them up.

Carrie Roberts, a friend of Manard's and Yardley's, received a phone call from Yardley sometime between 6 and 7 p.m. Yardley wanted a ride and told her that this was a "death or death situation." Roberts picked up Yardley and Manard. According to Roberts, Yardley was not freaked out or scared, but he was serious. Roberts asked if they killed someone; they did not answer, but looked at each other. She said, "I don't want to know." Roberts dropped them off at a trailer park in downtown Gardner and went back to work.

Pam Wade, a friend of Manard's, received a page after her 2 to 6 p.m. work shift. When she returned the page, it was Manard, asking her to be at home later that evening. Manard told her that he had gotten into some trouble.

Manard and Yardley arrived at Wade's mobile home between 9 and 9:30 p.m. When Manard came in, he threw a gear shift knob onto her bed and said, sarcastically, that "it was a souvenir." Manard was "jumpy" and "something was bothering him." Manard gave Wade the shirt he was wearing telling her to burn it. However, she washed the shirt several times and kept it. The gear shift knob, t-shirt, and a pair of sunglasses worn by Manard were later recovered from Wade's home during the execution of a search warrant. The gear shift knob was analyzed and determined to be the style and model that would fit the LeBaron. Shawna Miller, a friend of Yardley's and Manard's, went to Wade's home late the evening of June 13. She saw the gear shift knob on Wade's bed. When she asked what it was, Yardley answered that it was a souvenir. According to Miller, Manard and Yardley wanted to watch the news.

The next afternoon Miller and Yardley walked to a convenience store. Yardley picked up a copy of the Kansas City Star and found an article on a shooting in Overland Park. Yardley made a comment about the newspaper article, saying that there was not a chase, because they could not catch Manard. Yardley asked Miller not to

say anything, because "his ass was going to the frying chair." He also said that when he screwed up, he screwed up good.

The autopsy revealed that Donald died from a single gunshot wound. A .45 caliber Remington Peters +P bullet was recovered from his body.

About a week later, in Gardner, a police officer observed four people in the cab of a truck. The officer stopped the truck for a possible municipal code and state law violation. Wade, Manard, and Yardley gave the officer false names. Manard was driving and told the officer that he was often confused with his brother John Manard. The officers had seen a composite sketch and knew that the Metro Squad investigating the England homicide was interested in talking with "John Manard." Based on the name and resemblance to the composite, the Gardner officer contacted the Metro Squad. The occupants of the truck were separated. Manard took off running. Yardley, Wade, and John House, the owner of the truck, were arrested. Police questioned Wade. She told them about the gear shift knob and Manard's shirt.

The following day, a search warrant was executed at House's residence. Ammunition (.22 caliber and 12 Remington Peters +P .45 caliber rounds) was recovered from a blue duffle bag. The bag was identified as looking like Yardley's. One of the fingerprints recovered from the exterior of the LeBaron was determined to be Manard's.

Later that night, a search warrant was executed on House's truck. The officer conducting the search pulled a handgun out from under the passenger side seat of the truck. The gun was an Essex Arms .45 caliber semi-automatic handgun with "Gordy" etched on the side. A toolmark examiner concluded that the bullet that killed Donald England was fired from the gun with the inscription "Gordy." Wade later testified that she had seen Manard with a gun before June 13; she saw Yardley with the gun after June 13. The gun she saw had "Gordy" written on it.

Rojas (the hair stylist) was shown a photograph lineup containing Yardley's photo. Although she was unable to make a positive identification, Rojas said the photo of Yardley looked like the person who shot Donald. Debra was shown the same lineup on a later

date. While unable to make a positive identification, Debra also said that the photo of Yardley looked like the individual who shot her ex-husband. Neither Debra nor Rojas could make a positive identification at trial.

Mark Vargo, an Overland Park police officer, was sent to Gardner to help in the negotiations with Manard, who had been located in an apartment complex in Gardner. Manard was arrested after a lengthy standoff. Two days later Vargo spoke with Manard for about 20 minutes. Manard told Vargo that he wanted a deal. Manard admitted his and Yardley's involvement in the robbery and said that he drove the car. His statement was the subject of a motion to suppress and hearings on redaction of the statement. Neither Manard nor Yardley testified at trial.

## DISCUSSION

Manard's statement to Officer Vargo incriminated both himself and Yardley. Manard said that he and Yardley had simply intended to steal a car, and that Yardley was the one who shot the victim. Manard maintained he only drove the car. Yardley made no incriminating statements.

### The Joint Trial

Use of Manard's statement became an issue when the State moved to consolidate the trials. The State acknowledged the problem of introducing Manard's incriminating statement when Manard would not testify and Yardley was a defendant. The State commented that it would be difficult to redact the statement in a way that would both protect Yardley's confrontation rights and make sense to a jury.

The district court ordered the State to redact the statement omitting any reference to Yardley. Officer Vargo was instructed not to refer to Yardley or say that there was another person present during the crime.

Manard takes issue with the consolidated trial on the ground that he was prejudiced by the redacted confession, testimony, and limited cross-examination of Officer Vargo at trial. Specifically, Manard argues, "In this joint trial, the protection of Mr. Yardley's

constitutional rights resulted in a violation of Mr. Manard's constitutional rights."

Vargo was called as the last witness in the State's case in chief. Both Yardley and Manard objected to Vargo's testimony on the redacted statement and moved for a mistrial. They argued their defenses were antagonistic and each defendant's right to confront witnesses was being violated. Manard's defense was lack of intent to rob or kill. Yardley defended on the basis that he was not present at the shooting.

After listening to extensive arguments, the district court denied the motions and allowed Vargo to testify. However, Vargo could not refer to Yardley or relate Manard's statement that "Yardley shot the dude." Manard argued that the court's order impermissibly interfered with his right to conduct a proper cross-examination of Vargo. Counsel made a proffer of what he would elicit on cross-examination of Vargo. After direct examination by the State, Manard's counsel renewed his objections and motion for a mistrial. Counsel refused to cross-examine Vargo, contending the court's order did not allow a proper cross-examination.

Yardley then cross-examined Vargo about Manard's statements. Yardley's cross-examination focused on Manard's intent to secure a "deal" from the district attorney. Manard again objected, asserting that because of the redactions Yardley had no standing to cross-examine Vargo. The objection was overruled, but Yardley was forced to end his cross-examination when it exceeded the scope of direct.

Yardley then called Vargo as a defense witness. Vargo recalled Manard saying that he (Manard) remembered seeing blood. Yardley used Manard's statement about seeing blood during closing argument to imply that Manard was the shooter.

Manard's claim of joint trial error is based on two contentions regarding the redacted confession. Because both of his contentions fail, we find no error in the district court's refusal to grant separate trials.

## The *Bruton* Issue

Manard's confession had to be redacted for use at trial under *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). *Bruton* holds the admission of a defendant's confession implicating another codefendant at trial is prejudicial error when the codefendant has no opportunity to cross-examine the confessing defendant. 391 U.S. at 137. We followed *Bruton* in *State v. Rodriquez*, 226 Kan. 558, 601 P.2d 686 (1979). We have allowed courts to redact incriminating statements for use in joint trials. *State v. Purdy*, 228 Kan. 264, Syl. ¶ 2, 615 P.2d 131 (1980) (the introduction into evidence of a defendant's redacted statement is proper unless the redaction distorts the statement). In *State v. Rakestraw*, 255 Kan. 35, 871 P.2d 1274 (1994), a redacted confession was used at trial. Rakestraw was convicted and his codefendant acquitted. We reversed the conviction and remanded for a new trial because the redaction distorted Rakestraw's actual statement. A redacted statement is impermissibly distorted when "the complete statement is exculpatory and the redacted statement is inculpatory." 255 Kan. at 45-46.

The analysis of the *Bruton* issue here is advanced by setting out the complete and redacted statements.

The complete statement from Officer Vargo's preliminary hearing testimony is set out below:

"Q. [PROSECUTOR] Okay. What did he tell you?
"A. [OFFICER VARGO] He said—we first got into the conversation I said that I didn't think he had shot anyone, and he said no he didn't shoot anyone. He didn't want to go down for something someone else did.
"Q. Okay. What else did he say?
"A. I asked him if he was there when Mr. England got shot. He stated yes, he was. He then stated that, he said, Yardley shot the dude', and Yardley fucked me.'
. . . .
"Q. He told you that he thought, using his words, that Yardley had fucked him?'
"A. Yeah.
"Q. Did he elaborate on that?
"A. He just, he said that a lot through the whole time he was there talking to him and he basically was, he said he didn't want to go to jail for the rest of his life for something someone else did.

"Q. Did Mr. Manard explain to you what they were doing at the scene of the shooting?

"A. He stated to me that later in the conversation he explained why they were trying to get a car.

"Q. Okay. He said they were trying to get a car?

"A. Yeah, to get back to Edgerton.

"Q. Okay. And did he tell you how they were planning on getting a car?

"A. He told me that they had a plan to get a car back to Edgerton, they were going to wait at a gas station and wait until someone went inside and left their keys in their car or their car running to pay for their gas around there, were going to jump in a car and just take off. And he said Yardley had the gun, was supposed to keep it tucked in his waistband.

"Q. Uh-huh.

"A. And if anybody gave him a problem Yardley was to lift his shirt and show the gun so if they had a problem with someone refusing to give him a car.

"Q. In other words, he indicated to you the gun was there, they were to use the gun for intimidation?

"A. Right.

. . . .

"Q. So then what happened?

"A. That was later on in the conversation. He said that the first part of the conversation we talked about, I asked him after he told me I asked him what happened when he had told me that Yardley had shot the dude. He said that he was trying to get the car in gear and Yardley already had the gun out and it was cocked and while he was trying to get the car in gear Yardley opened the door and tried to get the guy out and the guy tried to kick Yardley. Then he said he heard a lady scream at him and he heard the shot and looked over and saw the man fall down and the blood. He said he yelled at Yardley, 'Why did you shoot him?' And then he told me it wasn't supposed to happen that way.

"Q. So, if we could back up a little bit. Did he indicate to you who got in the car first?

"A. No. From what I gathered he did because he was trying to get the car in gear.

"Q. So, he sits in the car, he's trying to get the car in gear?

"A. Uh-huh.

"Q. Did he indicate whether he was having any difficulty getting the car in gear?

"A. Yeah. I believe he said he was trying to get it in gear.

"Q. While he's trying to get it in gear what's happening with Yardley and the guy that got shot?

"A. He's arguing with the guy and the guy kicks him and the lady started yelling at him from somewhere and he heard the shots and looked over and saw the guy fall in the blood on his chest.

"Q. Then did he say after that Yardley got in or how did that go?

"A. We didn't really get into that part of it.

"Q. Did he say what happened after that?

"A. I asked him why did he think Yardley shot the man and he said it was because he said he kicked him. And, I said, I asked him if they were taking any drugs or alcohol and he said that no they were both straight.
"Q. Did he indicate to you what they did with the car?
"A. No."

The redacted form of the statement heard by the jury is set out as follows:

"Q. [PROSECUTOR] Okay. And during the course of your conversations with Mr. Manard on Monday the 24th did he indicate to you whether or not he wanted to make a 'deal?'
"A. [OFFICER VARGO] Yes, he did.
"Q. Okay. Did he indicate to you whether or not he was present during the homicide that occurred on June 13th in your city?
"A. Yes, he did.
"Q. And did he say he was present?
"A. Yes, he did.
"Q. And did Mr. Manard indicate to you what role he played regarding that automobile?
. . . .
"A. He indicated that he was the driver of the vehicle."

Manard, relying on *Rakestraw*, argues that his statement was distorted because exculpatory statements were omitted from the redacted version, leaving only the inculpatory statements. Manard misapplies *Rakestraw*. *Rakestraw* suggests a reversal only when the entire statement is exculpatory to the offense charged and the defendant is deprived of a fair trial. See 255 Kan. at 45-46. Here, Manard's entire statement was not exculpatory. His defense was lack of intent to rob or kill anyone. Manard maintained that the original plan was to steal a car when the victim went inside to pay for gas. However, Manard also told Officer Vargo that Yardley had the gun, "[a]nd if anybody gave him a problem Yardley was to lift his shirt and show the gun so if they had a problem with someone refusing to give him a car." That statement is *inculpatory* to a charge of aggravated robbery and directly refutes Manard's defense of no intent. Thus, his entire statement was not exculpatory to the crimes charged.

### Cross-examination of Officer Vargo

Manard next contends that the State and Yardley each had the opportunity to extract the testimony they wanted from Officer Vargo. However, because of *Bruton* concerns, Manard was unable either to ask about any of the exculpatory statements or to rehabilitate himself after Yardley's counsel attacked Manard's credibility. There are two separate incidences where Manard claims he was denied his Sixth Amendment right to cross-examine the witnesses against him: (1) when Vargo was called to the stand as a witness for the State; and (2) when Vargo was called as a defense witness for Yardley.

We first review the cross-examination of Vargo as a witness for the State. Manard's counsel refused to cross-examine Vargo after Vargo testified in the State's case in chief. Counsel's refusal is suspect as invited error. See *State v. Plunkett*, 261 Kan. 1024, 1033, 934 P.2d 113 (1997) (litigants may not invite and lead a trial court into error and then complain of the trial court's action on appeal).

Counsel proffered that he would elicit the following facts on Vargo's cross-examination. Manard: (1) wanted to tell his side of the story, and cooperate; (2) admitted being present at the shooting; (3) said Yardley shot the dude; (4) said he heard a lady yell at him as he was trying to get the car in gear; (5) said he was the driver; (6) indicated the original plan was to wait at a gas station until someone went inside to pay, and then steal their car; and (7) was emotionally upset while relating these details to Vargo, even crying at times.

As the prosecution pointed out, Manard's counsel was free to elicit all of these facts except (3), that "Yardley shot the dude." The district court did not prevent counsel from cross-examining Vargo as to the balance of the statements. Counsel's refusal to cross-examine erodes Manard's argument on appeal that he was deprived of his Sixth Amendment right.

Manard's counsel also refused to cross-examine after Vargo was called in Yardley's defense. Yardley elicited testimony from Vargo concerning Manard's statement that he saw blood. Yardley used this testimony in closing argument to imply that Manard was the

shooter, because only the shooter would have seen any blood. Manard argues that Yardley's questioning opened the door for a full cross-examination of Vargo and acted as a waiver of Yardley's confrontation rights. Manard cites no authority for this interesting "waiver" argument.

Yardley should not have been allowed to elicit additional incriminating statements to support his theory that Manard was the shooter and Yardley was not present. Yardley's direct examination of Vargo went beyond the redacted version of Manard's statement. The redaction was ordered to protect Yardley's confrontation rights. Yardley took advantage of the redaction ruling by attempting to incriminate Manard as the shooter and exculpate himself. Yardley's approach created a contradiction of the complete statement.

Manard's argument is that the district court abused its discretion by allowing the additional direct examination of Vargo by Yardley's counsel. We agree. Before we may declare any error of constitutional magnitude harmless, we must declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Bowser*, 252 Kan. 582, Syl. ¶ 2, 847 P.2d 1231 (1993). The error here was harmless beyond a reasonable doubt. The jury convicted both Yardley and Manard of aggravated robbery and felony murder. The convictions reveal that the jury believed that Yardley was present during the crimes. Furthermore, the circumstantial and physical evidence against Manard and Yardley was overwhelming.

### The *Batson* Issue

The district court overruled Manard's *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), objection to the State's alleged "gender-based strike" of a potential juror.

Our standard of review on this issue is abuse of discretion. *State v. Harris*, 259 Kan. 689, Syl. ¶ 6, 915 P.2d 758 (1996). *Batson* holds a State's privilege to strike jurors though peremptory challenges is subject to the Equal Protection Clause. 476 U.S. at 89. *Batson* dealt with race-based peremptory challenges, but was extended beyond race to gender in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994). We have

followed *Batson*. See *State v. Hood*, 242 Kan. 115, 744 P.2d 816 (1987).

The *Batson* dispute here arose when the State used a peremptory challenge to strike a young, African-American female juror from the alternate pool. Manard objected. At this point, the district court found a prima facie case had been made based on race, and requested a race-neutral explanation from the State. The State responded that it had "not left any young, single females in that age category or below on [the] panel." Manard then shifted his objection to gender. The district judge found that a prima facie case had not been made as to gender, and said: "I think the State is striking jurors based on age." The jury ultimately consisted of 8 females and 4 males. Apparently, the lowest age on the jury was 42. The district court's conclusion that the State was striking jurors based on age, and not gender, is supported by the evidence.

Age-based preemptory strikes do not constitute a "cognizable group" for the purposes of a *Batson* challenge. See *U.S. v. Ferguson*, 935 F.2d 862, 865 (7th Cir. 1991), *cert. denied* 502 U.S. 1045 (1992). For a well-reasoned opinion holding that *Batson's* equal protection analysis does not apply to preemptory challenges based on ages of prospective jurors, see *Bridges v. State*, 116 Md. App. 113, 695 A.2d 609 (1997).

### Manard's Statements to Officer Vargo

Manard next argues that the district court erred in refusing to suppress his statements to Officer Vargo. Two days after Manard was arrested and invoked his right to counsel, he initiated contact with Officer Vargo. Manard left a telephone message stating he wanted to talk to Vargo. Vargo went to the detention facility and spoke with Manard. The prosecutor questioned Vargo at a hearing on a motion to suppress as follows:

"Q. [PROSECUTOR] And did you spend some time at the beginning talking about why you were there?

"A. [OFFICER VARGO]: Yeah. First we — I asked him how he was doing and he said he was — he didn't like being alone, he was sorry for running the previous few nights before, that he didn't like being in jail. He told me he wanted to tell me his side of the story.

"Q. Did you at any time preliminarily make it clear to him as to why you were there?

"A. Yeah. I told him that the only reason I could talk with him is because he initiated the contact with me.

"Q. Did he acknowledge that?

"A. Yes, he [did].

"Q. Okay. And so, then you're telling us he also said he wanted you to hear his side of the story?

"A. Right.

"Q. Did you also tell him about what your role in this was in terms of what might happen to the things that he told you?

"A. Yes, I did. I told him I was still a police officer and I had to make a report on anything he told me and I would have to testify to that in court, and that if he asked for his attorney, I wouldn't ask him anymore questions.

"Q. Okay. Did he acknowledge that?

"A. Yeah. He said he understood and he wanted to cooperate.

"Q. Okay. And then I guess my question would be: After that, did he let you know . . . that he wanted to talk to you and tell you about what had happened the night of this killing?

"A. Yes, he did."

Vargo left to discuss Manard's confession with the district attorney and see if a plea bargain could be arranged. During this time, Manard sought the attention of a sergeant in the detention unit. Manard said he was upset. He was crying and wanted to call both his mother and Vargo. When Vargo returned, Manard made additional incriminating statements.

We affirm admissibility of an accused's extrajudicial statement if the district court's ruling is supported by substantial competent evidence. *State v. Bailey*, 256 Kan. 872, 882, 889 P.2d 738 (1995). Manard does not deny that he initiated the conversation with Vargo. He questions whether there was a valid waiver of his previously asserted Fifth Amendment right to counsel. Manard correctly points out that the voluntary initiation of conversation does not constitute a knowing and intelligent waiver of the right to have counsel present. Once an accused invokes the right to counsel, further interrogation should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). However, if a conver-

sation initiated by the accused takes place after invoking the right to counsel, the burden remains upon the State to show a waiver of the defendant's Fifth Amendment right to have counsel present. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983).

Manard received *Miranda* warnings upon his initial arrest July 22, 1996. Vargo did not re-read the *Miranda* warnings before the July 24 conversation. However, he did tell Manard that he (Vargo) would have to make a report on anything Manard said, and testify to it. Vargo also testified that he told Manard "that if he asked for his attorney, I wouldn't ask him anymore questions." The July 24 warnings were given by Vargo before taking statements from Manard.

Manard argues the July 24 warnings were not enough. He reasons the lapse of time from the initial *Miranda* warnings to the time of the confession to Officer Vargo (2 days) was too long. Manard asserts the July 24 warnings did not fully inform him that he still had the right not to speak to Vargo or have an attorney present. Contrary to Manard's argument, warnings given by Officer Vargo were sufficient to alert Manard to the fact that he had a continuing right to have counsel present. This conclusion is borne out by Manard's later statement that he would tell his attorney to "fuck-off" if his attorney did not let him talk to Vargo again. Manard was aware that he had the right to have an attorney present. The district court's ruling is supported by substantial competent evidence.

## Jury Instructions - Aiding and Abetting

The district court used the Pattern Instructions for Kansas (PIK Crim. 3d 54.05, Responsibility For Crimes of Another) in formulating the jury instruction at issue here. Manard asserts that the aiding and abetting instruction was erroneous. We specifically approved PIK 54.05 in *State v. Minor*, 229 Kan. 86, 89, 622 P.2d 998 (1981). Manard's argument lacks merit.

## Closing Argument

Manard claims prosecutorial misconduct during the State's closing argument. He complains that the prosecutor (1) referred to

Manard as a "punk"; (2) stated that Manard wanted a "deal" but "didn't get one"; (3) commented that Manard and Yardley "like guns"; (4) asked the jurors to place themselves in the position of the eyewitnesses to the homicide; and (5) told the jurors if they did not believe these were the "right guys" then the defendants would be free to go. Manard admits there were no contemporaneous objections to these statements, but argues the issue was brought to the attention of the district court in a motion for new trial. We find no error in the prosecutor's statements.

### The Complaint

Manard asserts that the complaint charging aggravated robbery is jurisdictionally defective because it omits the language that the taking was "by force or threat of bodily harm." K.S.A. 21-3426, 21-3427. Manard filed a post-trial motion for arrest of judgment under K.S.A. 22-3502. The district court heard argument on the motion and denied relief. Because this issue was properly raised in the district court, we review Manard's claim under the cases preceding *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990). See *State v. Sanford* 250 Kan. 592, 601, 830 P.2d 14 (1992).

Count II of Manard's complaint alleged:

"That on or about the 13th day of June, 1996, in the City of Overland Park, County of Johnson, State of Kansas, JOHN MICHAEL MANARD, did then and there unlawfully, feloniously, intentionally and willfully take property, to-wit: a Chrysler Le Baron automobile from the presence of another, to-wit: Donald G. England, and did inflict bodily harm upon Donald G. England in the course of such robbery . . . in violation of K.S.A. 21-3427."

This issue is controlled by *State v. Spears*, 246 Kan. 283, 788 P.2d 261 (1990); and *State v. Barncord*, 240 Kan. 35, 726 P.2d 1322 (1986). Here, force was used to obtain the LeBaron. Count II states "and did inflict bodily harm upon Donald G. England in the course of such robbery." As the district court observed, the only difference between the language in count II of Manard's complaint and the language in *Spears* and *Barncord* is the word "by." Manard's aggravated robbery count used the word "and" instead of "by." Count II states the bodily harm occurred in the course of the robbery. Manard's argument fails.

Manard's final claim is that his convictions violate double jeopardy principles codified at K.S.A. 21-3107. We rejected a similar claim in *State v. Mims*, 264 Kan. 506, 517, 956 P.2d 1337 (1998) (convictions and consecutive sentences for felony murder and aggravated robbery involve different elements and therefore do not violate principles of double jeopardy or Kansas law). *Mims* controls. Manard's argument fails.

Affirmed.