No. 87,017

STATE OF KANSAS, *Appellee*, v. MICHAEL WHITE, *Appellant*.

67 P.3d 138

Opinion filed April 25, 2003.

*Stephen B. Chapman,* of Kansas City, argued the cause and was on the brief for appellant.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Michael White appeals from his convictions of two counts of first-degree murder, two counts of attempted first-degree murder, two counts of criminal possession of a firearm, and one count of conspiracy to commit first-degree murder. White was sentenced to two consecutive life sentences in prison. He does not raise any challenges to his sentences, but appeals his convictions, arguing the trial court erred in (1) denying his motion for a severance from the trial of codefendants, (2) admitting redacted statements of the codefendants, (3) admitting his redacted statement, (4) denying his motion to suppress his statement, and (5) denying his motion to dismiss for speedy trial violations. We affirm.

## FACTUAL BACKGROUND

White's convictions stem from two separate drive-by shootings in January 2000. The first occurred on the night of January 24, 2000. According to the testimony of Marcus Quinn, he and Joseph Morton were drinking beer in a car parked in an empty lot located across the street from Quinn's home near 20th Street and Longwood in Kansas City, Kansas. While sitting there, Quinn saw a red truck followed by a white car. About 30 minutes later, Quinn saw the same red truck and white car. This time both vehicles stopped and the occupants of the truck shot multiple times at the Chevrolet Caprice in which Morton and Quinn were sitting. Quinn testified

that the right side of his head was grazed, but he was not seriously injured. Morton walked away from the scene, but died at the hospital. Police investigating the incident found 22 spent shell casings at the intersection from three different calibers of weapons.

The second shooting occurred in the early afternoon of January 26, 2000. Christopher Union and Lee Brooks were driving a white pickup truck when as many as 50 gunshots were fired at the truck. Both Brooks and Union were hit by bullets; Union died from the injuries.

The police investigation of the two shooting incidents eventually led to the custodial interrogations of Michael White, Shawndell Mays, Keith Mays, Peter Davis, and Carvell England. All of them talked to the investigators, describing the events of the two shootings to various degrees, with Shawndell Mays and White admitting to firing shots during both incidents and all of them admitting to being a witness to one or both occurrences.

In the same information, the State charged White, Shawndell Mays, Davis, Keith Mays, and England with various charges relating to shootings on January 24, January 26, or both. The five codefendants' joint trial lasted nearly 3 weeks during which 39 witnesses testified. Generally, all of the defendants denied the allegations and, through cross-examination of the State's witnesses, sought to create reasonable doubt. They also generally relied upon a self-defense theory.

Before trial, the court conducted a lengthy hearing in which counsel reviewed each codefendant's statement and determined how the statements should be edited to remove any references to other defendants. At the trial, recordings of the edited statements of the five codefendants were played for the jury over objections by defense counsel. The versions played to the jury reflected the changes agreed upon by counsel and the trial court, including removal of most plural pronouns, direct references to other defendants, and questions or answers relating to the actions of other defendants. Through the use of compact disc and digital editing technologies the sound recordings were altered to reflect the changes. The resultant recordings had no pauses where material

had been removed. The jury was not given written copies of the statements.

White's statement illustrates the editing that occurred and, since White did not testify, provided his version of events and his self-defense theory. At the beginning of the recording, the detectives stated there had been prior discussions in which they had introduced themselves and advised White of his *Miranda* rights. White had read the "Advice of Rights" form aloud, initialed the rights, and signed the waiver indicating a willingness to talk to detectives. A detective asked White to give some background about the on-going conflict between White and the Quinns. During a conversation of some length, approximately five transcribed pages, there was dialogue in which White explained that he, the Mays family, and others were in an ongoing dispute with the Quinn family and their associates. White indicated that he used to "be cool" with the Quinns and sold drugs for them. He then had a falling out with the Quinns and, according to White, they had a person shoot him. In 1997, approximately 7 months after the falling out, a 10-year-old girl who was a friend of White's and a cousin of the Mayses was killed in a drive-by shooting which White blamed on the Quinns. White described the ongoing nature of the dispute, the violence involved, and identified locations, including businesses, where he could not go because the Quinns would shoot him. The next two questions and corresponding answers were deleted from the recording. They were:

> "Q: And I think that you indicated earlier that the Mays family and yourself had finally gotten sick of this, isn't that right?
> "A: Yep.
> "Q: Tell us what was the breaking point or what was the last straw?
> "A: We bust them."

The detectives then focused on the January 26th shooting of the occupants of the white pickup truck. White described the truck, indicated he was in a black Suburban, and stated he had a "nine Beretta." When asked where he was in the Suburban, he replied: "In the front seat." Many questions and answers were edited out of this portion of the statement. The edited material related to who else was in the Suburban, the presence of a second car, and who

was in the second car. The following questions were asked about what happened. Any material edited out of the recording is underlined.

"Q: Alright now when you come upon this truck what did you see and what did you say?

"A: I said, 'there go the Quinns.'

"Q: Everybody in the Suburban how did they react to that?

"A: 'There's the Quinns' and they was like, they started reaching for they guns.

"Q: Who everybody in the Suburban or everybody in the truck?

"A: Everybody in the truck cause they started driving off like they started skidding and they driving off fast you know what I'm saying. And they tried to put their truck in park.

"Q: And when you say they are reaching for their guns, what do you mean?

"A: They was going to shoot at us.

"Q: Did you see their guns?

"A: Saw them doing just like this (demonstrating).

"Q: And for the record he indicates with his left hand reaching across his body. And to you did that appear that they were going for their guns?

"A: Yes sir."

Answering questions about who was in the truck, White replied he believed it was Tommy Quinn and Stevie Ray Quinn and stated why he believed that. Nothing was edited from this portion of the statement.

The next seven questions and answers were deleted; these questions asked about the actions of White's codefendants during this time.

The questions then focused upon White's activities and the following exchange occurred, with the one word that was digitally removed from the recording underlined:

"Q: And do you know how many shots you fired?

"A: About four.

"Q: No I'm talking on North 30th, how many shots did you fire?

"A: I fired four.

"Q: From the Beretta?

"A: Yes.

"Q: How many shots were fired from the pick-up truck? Did you even notice anyone firing at you?

"A: They didn't get time to.

"Q: When you say they didn't get time to, why didn't they get time to?

"A: Cause <u>we</u> didn't let them get they guns.
"Q: You didn't let them get their guns? Is that correct?
"A: Yes sir."

The questioning then turned to activities after the shooting in which White described how the Quinns had pursued the car White was in and fired shots at a busy intersection. Throughout this passage, references to other defendants and plural pronouns were digitally removed.

Detectives next focused upon the shooting of January 24. White stated that he was in a red Jeep or Blazer. He explained that he went by the Quinns' house that night because earlier that day the Quinns had fired shots near a business known as the "Snak Pak." The following transcript reflects what White said regarding the events near the Quinn home. Again, the underlining reflects the words which were deleted in the recording heard by the jury.

"Q: Now so later in the evening then you <u>guys</u> go by the Quinn's house and what do you see?
"A: We saw them in the field first and we rode through there again and they was ready to chop us down but we didn't let them get to us then.
"Q: Who actually did you see that you recognized?
"A: Mark and Tommy.
"Q: You talking about Marcus or you talking about Mark Brooks?
"A: Mark Quinn and Tommy Quinn.
"Q: And were they in the vacant lot across the street?
"A: Yes sir.
"Q: Were they in a vehicle?
"A: Yep, a gray Chevy but they drove, it was one, it was two gray Chevy's, they drove, one Chevy drove off. And then that's the Chevy that came around the block chasing us in, trying to shoot us.
"Q: Now the very first time you were around the block and it's already dark out is that correct?
"A: Yes sir.
"Q: Are the streetlights on or do you remember?
"A: Yes sir.
"Q: And that's how you were able to tell that it's the Quinn's because it's lit up?
"A: Yes sir.
"Q: Now do you see them with a gun then or do you <u>all</u> get out and start shooting?
"A: Yes sir they did have guns then.

"Q: Do you know who had what?

"A: Tommy Quinn had a 40 I think, it was a handgun, it, he didn't have no weak gun he had a handgun, a 40.

"Q: And Marcus?

"A: He had a AK or Tech.

"Q: Now did they actually shoot at you guys?

"A: Yes sir.

"Q: And where would they have been standing at when they were shooting at you?

"Q: By that garage.

"Q: Now where were you at in the Blazer?

"A: In the front seat.

"Q: Front passenger seat?

"A: Yes sir.

"Q: And do you recall who was driving?

"A: Little Keith.

"Q: And in the back, there would of been Ronnie and Bug? Yes or No?

"A: Yes sir.

"Q: Now did all of you get out and start shooting?

"A: No sir.

"Q: So when you were shooting it was from inside the vehicle?

"A: Yes sir.

"Q: And about how many shots did you fire?

"A: About four or five.

"Q: And do you know if you hit anyone?

"A: No sir.

"Q: Who were you aiming at or what were you aiming at?

"A: I was aiming at Marcus; I was aiming at the Chevy that was leaving.

"Q: Which was occupied with two people at that time?

"A: Huh-uh the Chevy that was leaving was Marcus Quinn driving.

"Q: Did you see anybody in the car with him?

"A: No he was by himself.

"Q: All right.

"A: He had on a red skully.

"Q: Now do you remember Shawndell or Samson getting out shooting also?

"A: No sir.

"Q: Were they in front of you or in back of you though?

"A: Front of us.

"Q: So your attention was really directed toward Marcus so if someone else is doing it your really not paying attention?

"A: Yes sir.

"Q: And do you remember about how many shots you heard all together?

"A: They was shooting back. They was a lot of shots I heard. Cause Stevie had a chance, he was trying to run out of the house and that's when we hurried up and drove off."

The statements of the other defendants were also edited to remove any references to White or other defendants. All defendants talked about the ongoing dispute between the Quinns and the defendants.

The State's witnesses included White's roommates and friends who testified to seeing him in or driving vehicles matching the description of the vehicles involved in the two incidents. A roommate also testified that White told her to watch the news "because we smoked that nigger Antwan." She thought White had a 9mm the night he made that statement. Other roommates remembered White talking about the news, and a few days later having other "guys" coming in and out all day with guns and, at one point in the day, coming back to the house and excitedly talking about a white truck. In addition, ballistic testing matched shell casings found at the scenes of the two shooting incidents to guns found at the scene of White's arrest.

Michael White was convicted by a jury of two counts of first-degree murder for the deaths of Joseph Morton and Christopher Union, two counts of attempted first-degree murder relating to the shooting of Marcus Quinn and Lee Brooks, two counts of criminal possession of a firearm, and one count of conspiracy to commit first-degree murder. White was found not guilty of aggravated assault.

The jury also found Shawndell Mays and Peter Davis guilty of various charges. Carvell England and Keith Mays were acquitted of murder, attempted murder, conspiracy to commit murder, and other counts.

## SEVERANCE

White argues that the trial court should have granted his request for a separate trial.

As the parties were discussing opening statements, counsel for Shawndell Mays indicated he would advise the jury of the findings of a psychiatrist who determined Mays had Post Traumatic Stress Disorder (PTSD) which had affected his reactions. One of White's codefendants requested a severance because he claimed the psychological defense justifying Mays' actions inferred that the other

defendants' actions were unjustified. White's counsel joined in the oral motion for a severance based on antagonistic defenses. The district court denied the motion, finding the defenses were not antagonistic.

Shawndell Mays' counsel did not refer to the psychological examination in the opening statement, but did call the psychiatrist, Dr. William Logan, as a witness. Dr. Logan testified that Shawndell Mays had PTSD resulting from the trauma of being the first one on the scene after his 10-year-old cousin was shot, being threatened by the Quinns, and having several friends shot. Dr. Logan testified that because of PTSD Shawndell might overreact in a situation, perceive danger quicker than others, and react more quickly to defend himself. He also stated that PTSD might be an explanation for why Shawndell fired 18 shots. In the closing arguments, Shawndell's attorney summarized Dr. Logan's testimony as explaining that when Shawndell "believes he's in a high stress situation or safety is threatened, he's prone to overreact and he has problems exercising good judgment."

K.S.A. 22-3202(3) allows two or more defendants to be charged in the same criminal complaint, information, or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting a crime or crimes. K.S.A. 22-3204 provides: "When two or more defendants are jointly charged with any crime, the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." Severance lies within the sound discretion of the trial court, and should occur when a defendant has established there would be actual prejudice if a joint trial occurred. *State v. Butler*, 257 Kan. 1043, 1062, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996); *State v. Hunter*, 241 Kan. 629, 633, 740 P.2d 559 (1987). If severance is denied, the party claiming error has the burden to establish the claim and must establish that there was clearly an abuse of discretion. See *State v. Pham*, 234 Kan. 649, 653, 675 P.2d 848 (1984).

The usual grounds for severance, sometimes referred to as factors establishing sufficient prejudice to mandate severance, are:

" ' "(1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants." ' [Citations omitted.]" *Butler*, 257 Kan. at 1063.

See *Pham*, 234 Kan. at 653.

White argues that the district court erred in denying his motion to sever because: (1) the defendants raised antagonistic defenses, (2) evidence in favor of White that would have been admissible in a separate trial was excluded, and (3) the confessions of the codefendants were calculated to prejudice White.

### Antagonistic Defenses

White's first argument, antagonistic defenses, has been referred to as the "most compelling ground for severance." *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 (1980). Antagonistic defenses occur when each defendant is attempting to convict the other or where the defenses conflict to the point of being mutually exclusive or irreconcilable. *State v. Anthony*, 257 Kan. 1003, 1018, 898 P.2d 1109 (1995). "The classic example of intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case." *Pham*, 234 Kan. at 655. Short of this type of dichotomy, defenses will not be deemed antagonistic. For example, a dispute over who was the more culpable, such as arguing over who was the triggerman versus the aider and abettor, is not antagonistic. See *Myrick*, 228 Kan. at 416-17; *State v. Sully*, 219 Kan. 222, 547 P.2d 344 (1976). Nor are inconsistent trial strategies. Further, the presentation of evidence by one defendant which is inconsistent with the evidence presented by another defendant does not make the defenses antagonistic. *Pham*, 234 Kan. at 654.

Shawndell Mays did not point the finger at White. Further, neither Dr. Logan's testimony nor Shawndell Mays' defense were irreconcilable with White's assertion that he acted in self-defense

and was objectively justified in doing so. White's statement was that he fired four or five shots after he was shot at or observed a known aggressor reaching for a gun. Dr. Logan's testimony did not negate such classic self-defense situations and implicitly strengthened White's contention that the tension between the two factions was intense. While there may have been some inconsistency in the evidence, there was not a dichotomy in the defenses. As presented, the defenses were not mutually exclusive. See *Pham*, 234 Kan. at 655. Nor has there been any showing of actual prejudice.

The trial court did not abuse its discretion in denying the motion to sever the trial on the basis of antagonistic defenses.

*Admission of Codefendants' Redacted Statements*

White contends the admission of the extrajudicial statements of his nontestifying codefendants violated his rights under the Confrontation Clause of the Sixth Amendment. White also argues that this is a grounds for severance, as the codefendants' statements were calculated to prejudice his rights.

White made and preserved a general objection to the admission of all the codefendants' redacted statements. Before trial, White had the opportunity to object to any alteration or to request additional editing. Subsequently, he has not made any specific objection to any portion of the statements or to the court's instructions. Rather, he complains that excising parts of the statement resulted in a choppy presentation that made it obvious to the jury that the statements were edited and thereby incriminated White.

A defendant is deprived of his or her Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. *Bruton v. United States*, 391 U.S. 123, 126, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). *Bruton* involved two defendants, Evans and Bruton, tried jointly for robbery. Evans did not testify, but the Government introduced into evidence Evans' confession, which stated that he and Bruton committed the robbery. The trial judge told the jury it could consider the confession as evidence only against Evans, not against Bruton. The United States Supreme

Court held that, despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses. 391 U.S. at 137. The Court concluded that the nature of some evidence is so "powerfully incriminating" that it overrules the prevailing presumption that a jury will follow instructions. 391 U.S. at 135-36. We followed *Bruton* in *State v. Rodriquez*, 226 Kan. 558, 601 P.2d 686 (1979).

However, compliance with *Bruton* does not mean that extrajudicial statements of nontestifying codefendants can never be admitted at trial. In *Richardson v. Marsh*, 481 U.S. 200, 211, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987), the United States Supreme Court upheld the use of a confession which had been redacted to remove all references to the codefendant. The case involved a joint murder trial of Marsh and Williams. The State had redacted the confession of Williams so as to omit all indication that anyone other than Williams and a third person had participated in the crime. As redacted, the confession indicated that Williams and the third person had discussed the murder in the front seat of a car while they traveled to the victim's house. The redacted confession contained no indication that any other person was in the car or had participated in the crime. Later in the trial, however, Marsh testified that she was in the back seat of the car.

The United States Supreme Court held that this redacted confession fell outside *Bruton's* scope and was admissible at the joint trial. The Court distinguished Evans' confession in *Bruton* as a confession that was "incriminating on its face," and which had "expressly implicat[ed]" Bruton. *Richardson*, 481 U.S. at 208. By contrast, Williams' confession amounted to "evidence requiring linkage" in that it became incriminating in respect to Marsh "only when linked with evidence introduced later at trial." 481 U.S. at 208. Rejecting contextual implication as a test for whether a statement was admissible, the Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211.

Applying this holding, this court has held that "redaction of a confession is proper if any suggestion of a codefendant's involvement in the crime charged can be eliminated from the statement, but generally an edited statement should not be admitted if it explicitly suggests the participation of the complaining defendant." *State v. Swafford*, 257 Kan. 1099, 1102, 913 P.2d 196 (1996); see also *State v. Porter, Green & Smith*, 228 Kan. 345, 350, 615 P.2d 146 (1980) (removal of name not sufficient when statement refers to other participants in the crime). In *Swafford* and its companion, *State v. Butler*, 257 Kan. 1110, 916 P.2d 1 (1996), we found that presenting a transcript to the jury which showed the deletions by leaving a blank or underlining the space where a word had been, violated the *Bruton* principle. However, this does not preclude the use of such statements with proper editing.

"Had another method of redaction been chosen, the result might have been different. For example, had the statement been redacted to remove the defendant's and Butler's names and all reference to their existence by removing a sentence or paragraph where their names appear so as not to leave blanks, the result might have been different. The question to be asked in each case is whether the redacted statement admitted eliminated not only the defendant's name, but also any reference to his or her existence. If the codefendant's redacted statement, standing alone without consideration of any other evidence, does not directly incriminate the complaining defendant, *Bruton* is not violated even when other admissible evidence indirectly implicates the defendant." *Swafford*, 257 Kan. at 1106-07.

See *Butler*, 257 Kan. at 1118.

Approximately 2 years later, the United States Supreme Court reached a similar conclusion when confronted with a method of redaction in which blanks had been left in the written statements. When portions of the statement were read by the officer who took the statements, he said "deleted" or "deletion" in place of any removed words. *Gray v. Maryland*, 523 U.S. 185, 140 L. Ed. 2d 294, 118 S. Ct. 1151 (1998). The United States Supreme Court held redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word "deleted," or a similar symbol, falls within *Bruton's* protective rule. 523 U.S. at 192. The Court distinguished and clarified the holding in *Richardson*, stating:

"*Richardson* must depend in significant part upon the kind of, not the simple fact of, inference. *Richardson's* inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' 481 U.S., at 208. The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson's* words, 'facially incriminat[es]' the codefendant. *Id.*, at 209 (emphasis added). Like the confession in *Bruton* itself, the accusation that the redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.' 481 U.S. at 208." 523 U.S. at 196.

In similar fashion to this court's suggestion in *Swafford* and *Butler* that additional editing could resolve the problem, the United States Supreme Court offered an example, suggesting that by changing the "me, deleted, deleted, and a few other guys" to "me and a few other guys" the statement could be admitted. 523 U.S. at 196.

In the current case, the statements were edited in a manner consistent with the guidance of *Swafford, Butler,* and *Gray*. All references to the other codefendants by name or description and most plural pronouns were removed. Thus, in most respects, the statements in this case are less accusatory than saying "me and a few other guys." However, this is not a situation such as presented in *Richardson* where the statements give no indication another person is involved. But, given the removal of entire sentences and blocks of questions to remove direct reference to any other actor, there is no way to determine the number of people involved or to determine the actions of any specific person other than the declarant. In similar situations a majority of courts have determined there is no *Bruton* violation. *E.g., United States v. Verduzco-Martinez,* 186 F.3d 1208, 1214-15 (10th Cir. 1999); see Richardson, *Casting Light on the Gray Area: An Analysis of the Use of Neutral Pronouns in Non-Testifying Codefendant Redacted Confessions under Bruton, Richardson,* and *Gray,* 55 U. Miami L. Rev. 825 (2001).

Additionally, the playing of digitally edited recordings obviated many of the problems created by the method utilized in the trials

of Swafford, Butler, and Gray for displaying or communicating the statements. Through the technology used in this case, no gaps were left at the point where material was deleted, whether one word or several lines were deleted. When it sounds as if a word is missing, the missing word is usually a pronoun and the listener cannot tell whether there was a deletion or whether, as happened many times during the recording, the speaker dropped his speaking volume, stopped speaking and changed course of thought, or utilized poor diction. Further, while there are contextual gaps, it is not obvious these gaps are the result of editing to delete reference to other participants.

The redacted statements eliminate all references to White's existence, do not direct the jury's attention to White, do not facially incriminate White, and do not violate the holding in *Bruton*. The district court did not err in admitting the redacted statements of White's codefendants.

### Admission of White's Redacted Statement

Next, White contends that the meaning of his own statement was substantially changed by the process of redaction. White fails to detail in his brief exactly what editing caused distortion, but complains generally that "the exculpatory self defense aspect was largely lost." The consequence, he argues, is that he was denied the ability to present his theory of defense and, therefore, under the holding of *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), was denied his right to a fair trial. This argument is without merit.

In *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980), we held that "[t]he introduction into evidence of a defendant's redacted statement is proper unless the redaction procedure distorts the statement." 228 Kan. 264, Syl. ¶ 2. In that case, we determined that removing references to a codefendant in order to comply with *Bruton* did not distort the statement. In contrast, in *State v. Rakestraw*, 255 Kan. 35, 871 P.2d 1274 (1994), we reversed the conviction and remanded for a new trial because the redaction did distort Rakestraw's actual statement.

This court stated:

"If the complete statement is exculpatory and the redacted statement is inculpatory, we must conclude that the redacted statement distorts the meaning of the complete statement. Our analysis need go no further. Under the facts of this case, we conclude the admission of the redacted statement over the defendant's objection distorted the meaning of the defendant's statement. He was denied a fair trial. We reverse and remand the case for a new trial." 255 Kan. at 45-46.

Subsequently, we applied the holding in *Rakestraw* when another appellant made the same argument as is made here by White. We stated:

"[The appellant] Manard, relying on *Rakestraw*, argues that his statement was distorted because exculpatory statements were omitted from the redacted version, leaving only the inculpatory statements. Manard misapplies *Rakestraw*. *Rakestraw* suggests a reversal only when the entire statement is exculpatory to the offense charged and the defendant is deprived of a fair trial." *State v. Manard*, 267 Kan. 20, 29, 978 P.2d 253 (1999).

Similarly, in this case, White's entire statement was not exculpatory and it did not become inculpatory through the editing process. Nor was the meaning of White's statement distorted. The trial court did not abuse its discretion in allowing the admission of White's statement or in refusing to grant a severance on the ground the redaction process denied him a fair trial.

## SUPPRESSION OF STATEMENT

White argues the trial court erred in denying his motion to suppress. Prior to trial, White filed a motion to suppress his statement because his statement was rendered involuntary as a result of the manner of the interrogation, the influence of drugs which he asserts made him incapable of waiving *Miranda* rights, threats by the law enforcement officers, and material misrepresentations. After a lengthy hearing on the matter, the district court denied the motion.

A dual standard of review applies to the review of this issue. *State v. Dang*, 267 Kan. 198, 199, 978 P.2d 277 (1999). A determination that a statement was freely, voluntarily, and intelligently given will be upheld if it is supported by substantial competent evidence, which is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.

*State v. Jacques,* 270 Kan. 173, 183-84, 14 P.3d 409 (2000). In making the factual review, the appellate courts will not reweigh the evidence (*State v. Baston,* 261 Kan. 100, 104, 928 P.2d 79 [1996]) and will give deference to the factual findings of the trial court (*State v. Henry,* 273 Kan. 608, Syl. ¶ 2, 44 P.3d 466 [2002]). The legal conclusion drawn from those facts is subject to de novo review. *Jacques,* 270 Kan. at 183.

To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Factors include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the free and independent will of the accused. *State v. Minor,* 268 Kan. 292, 297-98, 997 P.2d 648 (2000).

The district court determined White's statement was made freely and voluntarily. This determination is supported by substantial competent evidence.

William Howard, a detective of 5 years with the homicide unit of the Kansas City, Kansas, Police Department, testified about the circumstances surrounding White's statement. Detective Howard first came in contact with White in the interview room of the police department after White was arrested. White was advised of his *Miranda* rights and voluntarily waived those rights by reading aloud and signing the waiver on the "Advice of Rights" form. Detective Howard first conducted a preinterview for about 40 or 50 minutes and then recorded White's statement, giving him a chance to observe White for a significant period of time.

Detective Howard testified that White was coherent and wide awake. There was no physical contact between the men except for a handshake both before and after the interview, and neither he nor White was rude or insulting, according to Detective Howard. He also testified that no law enforcement officers made any kind of threat or promise such as dropping charges against White. Detective Howard countered White's testimony that White was high

on "wet " at the time of his interview with detectives. Detective Howard explained that "wet" is a cigarette dipped in chemicals such as PCP or formaldehyde. Detective Howard testified he had observed a number of individuals under the influence of "wet" whom he described as typically having a strong chemical smell, being very violent, and exhibiting extremely bizarre and rude behavior. White did not smell of drugs or alcohol and did not display any signs that he was under the influence of any substance, according to Detective Howard. At times during the statement, the detective felt White was a little emotional, but the detective attributed this to White being emphatic about what he wanted to share with the detective.

White and his mother testified at the hearing on the motion to suppress. Their testimony was at odds with Detective Howard's testimony. This presented an issue of credibility that was resolved in favor of the State's witness.

We do not reweigh the evidence, and substantial evidence supports the district court's finding that the statement was voluntarily made. Therefore, the trial court did not err in denying White's motion to suppress his statement.

## SPEEDY TRIAL ISSUES

White contends the district court erred in denying a motion to dismiss because his statutory right to a speedy trial was violated by (1) granting a 90-day continuance, (2) failing to start the trial within the extended deadline, and (3) granting a mistrial.

The question of whether there is a violation of statutory and constitutional rights to a speedy trial is a matter of law over which this court has unlimited review. *State v. Smith,* 271 Kan. 666, 681, 24 P.3d 727, *cert. denied* 534 U.S. 1066 (2001). It is well established that the statutory time period for a speedy trial starts on the date of arraignment. *State v. Jamison,* 248 Kan. 302, 304, 806 P.2d 972 (1991). The State is obligated to ensure the accused is provided with a speedy trial. *State v. Southard,* 261 Kan. 744, 746, 933 P.2d 730 (1997). A defendant is not required to take any affirmative action to see this right is observed. *State v. Bean,* 236 Kan. 389, 391, 691 P.2d 30 (1984).

K.S.A. 22-3402, in part, reads:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3)."

White was arraigned on April 12, 2000, and held in custody until trial. Trial was scheduled for July 10, 2001, within the 90-day period mandated by K.S.A. 22-3402(1).

### The 90-Day Continuance

On June 13, 2000, the State filed a motion for a continuance because material evidence, namely over 100 pieces of ballistic evidence, still needed to be tested and testing would not be completed by the trial date. White objected to the trial court granting the continuance, arguing the request was not in good faith since the State had not diligently pursued having the tests timely performed.

K.S.A. 22-3401 permits district courts in criminal cases to grant continuances to both the State and defendants for good cause shown. K.S.A. 22-3402(3)(c) defines the circumstances under which a continuance can be granted without violating a defendant's statutory right to a speedy trial.

"(3) The time for trial may be extended beyond the limitations of subsections (1) and (2) of this section for any of the following reasons:

. . . .

(c) There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next succeeding ninety (90) days. Not more than one continuance may be granted the state on this ground, unless for good cause shown, where the original continuance was for less than ninety (90) days, and the trial is commenced within one hundred twenty (120) days from the original trial date."

Over White's objection, the trial court granted the motion to continue the trial for up to 90 days and found that material evidence was unavailable and that the State acted in good faith.

"If there's over a hundred pieces of ballistics evidence that needs to be examined, that's all very meticulous work, it's very time consuming. Unfortunately, the people that can do that are very few and far between, and it appears to me that there has not been any sort of delay that's caused simply for the purpose of delay, that Ms. Lidtke's request is based upon a good faith basis."

White asks us to find that the trial court erred in rejecting his argument regarding the State's diligence and in not revisiting the finding when the State used a different expert at trial than the one discussed at the hearing on the motion to continue. After review of the record regarding this issue, we find that the trial court did not abuse its discretion in granting the continuance and, by operation of K.S.A. 22-3402(3)(c), White's right to speedy trial was not violated as long as the delay was no more than 90 days.

### Counting the 90 Days

White argues the trial court erred in calculating the time for speedy trial purposes. The court continued the trial from the original date of July 10 to October 3, 2000, less than a 90-day continuance. However, White interprets K.S.A. 22-3402(3)(c) to require the 90-day continuance to begin from the date the district court rules on the motion for continuance as opposed to the date the original trial was to begin. This argument presents an issue of statutory interpretation.

Interpretation of a statute is a question of law, and the appellate court's review is unlimited. An appellate court is not bound by the district court's interpretation of a statute. *State v. Engles*, 270 Kan. 530, 532-33, 17 P.3d 355 (2001). When a statute is plain and unambiguous, the intention of the legislature as expressed will be given effect. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 (2001) (citing *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 [1998]). In ascertaining legislative intent, various provisions of an act must be construed together with a view of reconciling and bringing them into workable harmony. *State v. Thomas*, 273 Kan. 750, 751, 46 P.3d 543, 544 (2002).

The portion of K.S.A. 22-3402(3)(c) allowing the 90-day continuance simply states that the trial may be continued if there are reasonable grounds to believe the trial can begin "within the next

succeeding ninety (90) days." The next sentence allows for another continuance for good cause shown if the original continuance was for less than 90 days "and the trial is commenced within one hundred twenty (120) days from the *original trial date.*" (Emphasis added.)

Although not specifically addressing the issue raised by White, on previous occasions when calculating whether a defendant's right to speedy trial has been violated, this court has utilized the trial date as the beginning date for counting. See *State v. Hines,* 269 Kan. 698, 703, 7 P.3d 1237 (2000); *State v. Green,* 254 Kan. 669, 672, 867 P.2d 366 (1994). Further, in reading the provisions as a whole, the legislative intent is clear that the trial date is to be the date from which the continuance is calculated.

We hold that the 90-day period under K.S.A. 22-3402(3)(c) is counted from the date of the trial setting, not from the date on which the motion to continue was granted.

### Speedy Trial & Mistrial

Finally, White argues his right to speedy trial was violated when a mistrial was declared after the State would not agree to proceed to trial with less than 12 jurors. This argument is without merit.

A mistrial was declared on October 6, 2000, because of the unavailability of jurors. After 12 jurors were impaneled and 2 alternate jurors were selected, but before evidence was presented, 4 of the 14 jurors were dismissed from service when the jurors came forward indicating they could not be impartial. The defendants agreed to proceed with less than 12 jurors. However, the State did not consent. Because this happened midday on a Friday, the district court felt additional jurors were unavailable. The court declared a mistrial.

K.S.A. 22-3423(1)(a) permits a trial court to terminate the trial and order a mistrial at any time termination is necessary because it is physically impossible to proceed with the trial in conformity with law. Terminating a trial and declaring a mistrial are largely within the discretion of the district court. A clear showing of abuse of discretion must be made before the mistrial decision will be set

aside on appeal. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999).

In this case, once the 4 jurors were dismissed, only 10 jurors remained. There was no written agreement by the parties to continue the trial with 10 jurors. See K.S.A. 22-3403. Absent a written agreement, the trial court was left with declaring a mistrial, and did not abuse its discretion in doing so.

The speedy trial statute, K.S.A. 22-3402(4), dictates how time is to be computed when the trial court grants a mistrial:

"(4) In the event a mistrial is declared or a conviction is reversed on appeal to the supreme court or court of appeals, the time limitations provided for herein shall commence to run from the date the mistrial is declared or the date the mandate of the supreme court or court of appeals is filed in the district court."

Nothing in the statute makes the time limitation dependent upon what caused the mistrial or which party caused the mistrial. In this case, since White was held in jail solely because of the charged crimes, the State had another 90 days to bring the defendant to trial from the date the mistrial was declared. The mistrial was granted on October 6, 2000, and the trial began on January 3, 2001, less than 90 days later.

White's statutory right to a speedy trial was not violated.

Affirmed.

ABBOTT, J., not participating.

DAVID S. KNUDSON, J., assigned.