(96 P.3d 680)
No. 89,545

STATE OF KANSAS, *Appellee*, v. DONALD J. HENDERSON, *Appellant.*

Opinion filed August 27, 2004.

*Charles O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREENE, P.J., MCANANY, J., and BRAZIL, S.J.

MCANANY, J.: Donald Henderson appeals his convictions for four counts of abuse of a child. We affirm his convictions.

*Background Facts and Procedural History*

Henderson is the natural father of M.H., born October 4, 1999. Candi Coker is M.H.'s natural mother. Dr. Unsderfer, M.H.'s pediatrician, had examined her in early December 1999 and found her to be in good health. Less than a week later, on December 7, 1999, Coker took M.H. to the hospital emergency room. Dr. Unsderfer happened to be on call at the hospital. Upon M.H.'s admis-

sion, Dr. Unsderfer initially found that she had fractures to her left femur and to two vertebrae, and a spiral fracture of her left tibia. Nuclear bone scans ultimately detected a total of 13 fractures, plus later-discovered fractures of the ulna and radius.

The presence of the spiral fracture in a 2-month-old, plus the number of fractures, was sufficient for Dr. Unsderfer to suspect abuse, particularly after tests disclosed the absence of osteogenesis imperfecta, also known as brittle-bone disease.

Shortly after M.H. was admitted to the hospital, Henderson told Police Officer Buller that he had made an appointment with a doctor to get medication for his temper problem. While awaiting the bone test results, Henderson told Dr. Unsderfer that he was nervous about the results of the test and that he was "sweating bullets."

By the time the negative bone test results were reported, Coker and Henderson had separated. Coker told Buller that she had a medical condition that required her to bathe several times a day. She recounted how she would leave M.H. in Henderson's care while she was bathing. On several such occasions she heard M.H. scream, as if in pain. She told Buller that it would sometimes take several hours to calm M.H. She also told Buller that Henderson had a bad temper. As a result of Buller's investigation, M.H. was placed in protective custody. Since her release from the hospital, M.H. has never had another broken bone.

Buller interviewed Henderson, who denied that he caused any of M.H.'s broken bones and said that he believed Coker caused M.H.'s injuries. He was not able to point to any specific instances that led to this belief, but felt Coker's "fuse was shorter than his."

Henderson voluntarily submitted to another interview on June 28, 2000, in the basement of Reno County Law Enforcement Center. Buller, KBI Special Agent Atteberry, and Henderson were initially present for the interview. Atteberry testified that Henderson was not in police custody and was advised that he could leave at any time.

Henderson is mildly mentally retarded and functionally illiterate, being able to read only at a second-grade level. As a result, Atteberry read Henderson his *Miranda* rights and had him initial each

line after he acknowledged he understood each line. Buller testified Henderson appeared to understand what was happening and responded appropriately to the questions. Henderson stated he understood his rights and agreed to the waiver orally and in writing. Buller then left the room to allow Atteberry to conduct the interview.

Henderson's responses to Atteberry did not cause Atteberry to believe that he should stop the interview or that Henderson was having difficulty answering his questions. Henderson eventually admitted to getting angry and frustrated when M.H. would not stop crying. He said that at one point he sat M.H. down very hard in her crib, and that another time he laid M.H. on the floor and stepped on her thigh to make her be quiet. At this point, Atteberry asked Buller to return to the interview room to record Henderson's statement. The rest of the interview was tape recorded. The opening dialogue in the recorded interview is illustrative:

> "Buller: Well, why don't you tell me then about the times where you pulled her arms.
>
> "Henderson: When she was in her crib laying down, like any other baby would and I went in there to feed her 'cause she was crying like she was wet or hungry or if somebody wanted to pay little attention to her so I went in there and I picked her up the wrong way and she got louder and louder. I just got a little, I have a, I'll admit I do have a small anger problem.
>
> "Buller: I'm aware of that. We've talked about that before.
>
> "Henderson: Uh-huh. That's why I'm taking Prozac.
>
> "Buller: So how does your anger play into this?
>
> "Henderson: I don't know how to control my anger at the time.
>
> "Buller: So you say she was in her crib and crying, wanting attention or to be fed.
>
> "Henderson: Uh-huh, or her diaper changed.
>
> "Buller: Or her diaper changed.
>
> "Henderson: One, one of those.
>
> "Buller: Okay.
>
> "Henderson: Like any other baby.
>
> "Buller: Yeah, like all babies. And so you went in and picked her up the wrong way. Are you, are you telling me that you were angry at that time, that you picked her up the wrong way?
>
> "Henderson: Yeah, because I was there all by myself and my ex, Candy, was gone practically most of the times anyways.

"Buller:      So when you say you picked her up the wrong way, what do you
              mean?
"Henderson:   I grabbed her up by the arm. You know, like I, I should have,
              like I should have . . .
"Buller:      And what was the right way to do it?
"Henderson:   By the head and by the arms, both arms. With the thumbs under
              the arms and the  . . .
"Buller:      All right. But instead you just picked her up by the arms?
"Henderson:   Uh-huh.
"Buller:      And in what way did you do that?
"Henderson:   I just kind of pulled her up.
"Buller:      Can you be more descriptive about how you pulled her by the
              arms?
"Henderson:   I just kind of pulled her up, straight up. That was wrong of me,
              but, I shouldn't have done it."

Henderson was ultimately charged with four counts of abuse of a child pursuant to K.S.A. 21-3609. Henderson filed a pretrial motion to suppress his statements, which the court denied following a hearing. Henderson was convicted on all counts. The court imposed consecutive sentences of 43 months on the first count and 34 months on each additional count. As a result of the "double rule," the court imposed a total sentence of 86 months' incarceration.

*Sufficiency of the Evidence*

Henderson claims there was insufficient evidence to support his convictions because the State did not prove intent. In considering this claim we review the evidence in the light most favorable to the State to determine if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Beach,* 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003). We do not weigh the credibility of witnesses. *State v. Lowe,* 276 Kan. 957, 965, 80 P.3d 1156 (2003). Furthermore, a conviction of even the greatest offense may be sustained by circumstantial evidence. *State v. Davis,* 275 Kan. 107, 118, 61 P.3d 701 (2003).

Abuse of a child is not a specific intent crime. It is not predicated on an intent to injure but rather on specified intentional acts that result in harm. See *State v. Carr,* 265 Kan. 608, 614, 963 P.2d 421 (1998). The jury instructions required a finding that Henderson

"intentionally inflicted cruel and inhuman bodily punishment" on M.H. In his police interview, Henderson said that in some instances he committed acts by which he did not intend to injure his daughter, and in other instances the acts themselves were committed by accident. As to the former, the intentional nature of the acts satisfies the intent requirement of the statute. It is apparent that the jury was satisfied that by these intentional acts he inflicted cruel and inhuman bodily punishment on M.H. As to the latter, when we view the evidence in the light most favorable to the State, it is apparent that the jury simply did not believe that his actions were accidental. In any event, there was ample evidence, direct and circumstantial, to satisfy the intent element of the crime and to satisfy Henderson's conviction.

*Motion to Suppress*

Henderson claims the trial court erred in refusing to suppress the statements he made to police during the June 28, 2000, interview. We review this claim to determine whether the factual underpinnings of the trial court's decision were supported by substantial competent evidence. In doing so we do not reweigh the evidence. We review de novo the ultimate legal conclusion drawn from those facts, since it is a matter of law. *State v. Alvidrez,* 271 Kan. 143, 145, 20 P.3d 1264 (2001).

First, Henderson claims his interrogation was custodial. In *State v. Jones,* 246 Kan. 214, 216, 787 P.2d 726 (1990), the court stated:

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless the State demonstrates the use of procedural safeguards to secure the privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, (1966); *State v. Roadenbaugh,* 234 Kan. 474, 476, 673 P.2d 1166 (1983)."

The trial court determined the June 28, 2000, interview was not a custodial interrogation. A custodial interrogation is " 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (Emphasis added.) *State v. Fritschen,* 247 Kan. 592, 599, 802 P.2d 558 (1990) (quoting *Miranda v. Arizona,* 384

U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 [1966]). Using an objective analysis that ignores his subjective beliefs, personality, and mental capacity (*State v. William*, 248 Kan. 389, 405, 807 P.2d 1292, *cert. denied* 502 U.S. 837 [1991]), a reasonable person would not have believed he or she was in custody when these statements were made to the police. Henderson was not under arrest. He came to the interview voluntarily. He was advised that he could leave at any time. In fact, when the interview concluded he was allowed to leave.

Even though the interrogation was not custodial in nature, Atteberry had already extended to Henderson the procedural safeguards described in *Jones* when he advised Henderson of his *Miranda* rights. Henderson initialed his understanding of his rights and signed the form waiving his rights.

Next, we review the trial court's conclusion that Henderson's statements were freely, voluntarily, and intelligently given. In doing so, we will uphold the trial court's decision if it is supported by substantial competent evidence. Once again, we will not reweigh the evidence but will give deference to the trial court's factual findings. We review de novo the legal conclusion drawn from those facts. *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003).

In *White*, the court discussed the test used when determining the voluntariness of a defendant's confession:

"To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Factors include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the free and independent will of the accused. [Citation omitted.]" 275 Kan. at 597.

Here, Henderson's confession was voluntary. Henderson was advised that he could leave at any time during the interrogation. Henderson was advised of his *Miranda* rights at the outset even though the interview was noncustodial. The officers adapted their questioning to accommodate Henderson's lower mental acuity. The officers testified that it appeared Henderson understood what was

happening and that Henderson responded appropriately to their questions. The initial portion of the colloquy in the recorded interview reproduced above illustrates this.

Henderson points critically to instances in the interrogation which he characterizes as attempts to put words in his mouth and to lead him into admissions. In each of these claimed instances, however, Henderson resisted the interrogators and refused to "take the bait." It is clear that Henderson understood what was being asked. He admitted to certain conduct and denied other. His statements were the product of the exercise of his free and independent will. Substantial competent evidence exists to find that Henderson's confession was voluntary. The trial court did not err in denying Henderson's motion to suppress.

*Closing Argument*

Henderson criticizes statements made by the prosecutor during closing argument. Though Henderson did not object at the time, the trial court has the duty to protect his right to a fair trial by preventing prosecutorial misconduct regardless of whether a timely objection was made. *State v. Holmes*, 272 Kan. 491, 498, 33 P.3d 856 (2001). Consequently, our standard of review is the same whether or not an objection was made at trial. Henderson has the burden of establishing that the claimed prosecutorial misconduct denied him a fair trial under the Fourteenth Amendment. *State v. Davis*, 275 Kan. 107, 121-22, 61 P.3d 701 (2003).

We must first determine whether the prosecutor's comments were outside the wide latitude that a prosecutor is allowed when discussing the evidence. If they exceed these bounds, we then must determine whether they were so gross and flagrant as to prejudice the jury against Henderson and deny him a fair trial. 275 Kan. at 121. If we reach this second step we must determine whether the prosecutor's comments show ill will, whether the trial court sanctioned the comment, and whether the evidence against Henderson was so overwhelming that the prosecutor's misconduct had little or no likelihood to have changed the result of the trial. *State v. Scott*, 271 Kan. 103, 115, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

The prosecutor argued in summation:

"And there is something about this case that's just could kind of tough. And part of it is the nature of kids. Nature gives babies, most babies protection. Deer, a baby fawn is born without any scent and has color spots on its coat. That's how it gets protection. Birds, they hatch out eggs up in trees where they can't be reached. They say that a gorilla baby when it's born has the strength of an adult male. Horses jump right up and they run away. Most animals have a defensive mechanism immediately. Baby rattlesnakes have just as much poison as adult rattlesnakes. Except for babies that are born to humans. They're born without any hair, any type of warmth. They're stinky; can't feed themselves. Can't walk. If you leave them alone, they'll die.

". . . Those babies rely upon their parents to protect them for life. That's one of the -- we got many that -- that's one of the basic rules of life. That's what is tough about this case. It is because you have got a father who betrayed that trust. And the fact that he might be low-functioning or illiterate doesn't excuse that.

"The evidence in the case is overwhelming the defendant committed those crimes. The facts establish it. The law establishes it, and we ask that you find him guilty. Thank you."

In *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000), the court stated:

"During closing argument, an attorney is given wide latitude in the language and manner of presenting argument and may indulge in impassioned bursts of oratory and may use picturesque speech as long as he or she does not refer to facts not disclosed by the evidence. [Citation omitted.]"

Henderson claims the prosecutor improperly referred to facts outside the evidence when he discussed the defense mechanisms of baby animals and the trust relationship between human babies and their parents. We are not surprised that evidence regarding baby animals or trust relationships was never presented at trial.

The charges against Henderson were tried to a jury of 12. One of the many reasons we hold inviolate the right to trial by jury is our understanding that the knowledge, experience, and judgment of one person is most often inferior to that of 12 members of the community. In seeking out members of the community for jury service, the courts do not limit the search to inhabitants of monasteries or nunneries or others who live a cloistered life. An important attribute of a jury is the collective common knowledge and wisdom it possesses from the varied experiences of its members

during their many years on this earth. Matters within the common knowledge of mankind are a proper subject for comment during the summation. See *State v. Jones*, 197 Ariz. 290, 306, 4 P.3d 345 (2000); *People v. Strozzi*, 712 P.2d 1100, 1105 (Colo. App. 1985); *Hall v. State*, 259 Ga. 412, 414, 383 S.E.2d 128 (1989); *McLaughlin v. State*, 780 P.2d 964, 968 (Wyo. 1989). The prosecutor, through these references in summation, sought to tap into that common knowledge and experience which is one of the core values of our jury system.

Granted, the prosecutor's statement about the strength of a baby gorilla or the venom of a baby rattlesnake may test the limits of our common knowledge. However, our condemnation of a prosecutor's arguing facts outside the record is based on the improper suggestion to the jury that there are facts directly bearing on the case that the jury should know but for some reason were not brought out in the evidence. That is not the case with references to baby gorillas and rattlesnakes. For rhetorical purposes, the prosecutor could just as well referred to the self-protective horn on the head of a baby unicorn.

Oratory is the essence of the summation. It brings to the courtroom the exercise of eloquent and effective public speaking. The constitutional insistence upon a fair trial for the accused does not demand that we ban oratory from the courtroom. To strip trial lawyers of analogies, similes, allusions (be they historic, poetic, literary, or scientific), and other rhetorical devices would reduce them to little more than green-eye-shaded bookkeepers, recounting for others the facts and figures they have accumulated during the course of the trial. We are taught in law school that a summation is more than the mere recital of facts adduced at trial. The trial lawyer's role in summation is to bring order to the facts presented at trial, place them in a meaningful context, and out of this collection of bits and pieces construct the whole of a case. Melvin Belli observed:

"If the tree, with its main branches, is painted, the leaves will be supplied by the brushes of the jurors, but if only the leaves are illustrated, they may fall into a confused mass where there is no support from the main branches." 5 Belli, Modern Trials § 65.4, p. 75 (1982).

We sometimes think of courtroom oratory as a quaint vestige of the past. It seems to have enjoyed a more honored place in past pronouncements:

"[No lawyer] is required to forego all the embellishments of oratory, or to leave uncultivated the field of fancy. It is his time-honored privilege to 'drown the stage in tears, make mad the guilty and appal the free, confound the ignorant, and amaze, indeed, the very faculties of eyes and ears.' " *State of Iowa v. Burns*, 119 Iowa 663, 94 N.W. 238 (1903).

Further, our modern courtroom sensibilities make us wince at remarks such as expressed by counsel during his summation in *Ferguson v. Moore*, 98 Tenn. 342, 39 S.W. 341 (1897), a breach of marriage contract and seduction case, in which he referred to defendant as a "fiend" and a "hell-hound." (The Tennessee Supreme court noted that "other language could have been used, no doubt, equally as descriptive, and not so vituperative." 98 Tenn. at 350.) And we may look askance at the approval of counsel's tearful plea to the jury. ("Tears have always been considered legitimate arguments before a jury, and . . . we know of no rule or jurisdiction in the court below to check them. It would appear to be one of the natural rights of counsel, which no Court or constitution could take away." 98 Tenn. at 351.) Nevertheless, the ancient role of rhetoric in final argument survives. We note an early expression of its importance in *VanDyke v. Martin, et al.*, 55 Ga. 466, 470 (1875):

"[The summation] is not a mere ornamental fringe, hung upon the border of a trial. . . . The attorneys in the cause are not mere carriers to bring in materials for constructing the edifice; they have a right, as representing the parties, to suggest where every important stone should be laid, and to assign reasons, drawn from legitimate sources, in support of their suggestions."

Over the decades, courts have become increasingly sensitive to the impact of improper argument upon an accused's right to a fair trial — thus, our concern with unwarranted wanderings from the record. Nevertheless, we have not left the trial lawyer so emaciated that he or she may no longer refer to the blueness of the sky or the breadth of the firmament without first calling a meteorologist or a cosmologist as an expert witness.

Modern courts have allowed references in summation from sources as disparate as the Bible (*Mayberry v. State*, 603 P.2d 1150

[Okla. Crim. 1979]; *People v. Wash,* 6 Cal. 4th 215, 24 Cal. Rptr. 2d 421, 861 P.2d 1107 [1993]) and the Ann Landers advice column (*Harris v. Pacific Floor Mach. Mfg. Co.,* 856 F.2d 64 [8th Cir. 1988]). In the case before us, we find that the prosecutor's comments did not exceeded these time-honored rhetorical bounds now tempered with attentive concern for Henderson's right to a fair trial.

Affirmed.