NOT DESIGNATED FOR PUBLICATION

No. 112,870

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REESE ADAM YOUNG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Harper District Court; LARRY T. SOLOMON, judge. Opinion filed February 19, 2016. Affirmed.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, LLC, of Wichita, and *Melanie S. Morgan*, of Morgan Pilate, LLC, of Kansas City, Missouri, and for appellant.

*Amanda G. Voth*, assistant solicitor general, for appellee.

Before ARNOLD-BURGER, P.J., GREEN and STANDRIDGE, JJ.

*Per Curiam*: Reese Adam Young was charged with one count of rape, one count of attempted rape, and one count of aggravated intimidation of a victim. At trial, the district court denied Young's request to admit exculpatory hearsay statements he had made to a police officer after his arrest in lieu of Young testifying himself about the conversation. On appeal, Young argues that the district court erred when it excluded his exculpatory hearsay evidence. Young also alleges that numerous instances of prosecutorial misconduct during closing arguments prejudiced him and require this court to reverse and remand the case for a new trial. Finding no reversible error, we affirm.

1

One afternoon, Young went to the home of his friends A.W. and C.O. At some point, Young and C.O. were alone together in the basement where C.O. resided. They talked for a while, and then Young stood up, walked over to C.O., and tried to kiss her. C.O. turned away from the kiss. C.O.'s rejection made Young angry, so he grabbed C.O.'s arms and pushed her backward onto her bed. He then got on top of C.O., holding her down. He attempted to kiss her several more times then undid his pants, pulled out his penis, shoved C.O.'s shorts to the side, ripping them in the process, and forced his penis inside of her. While Young was on top of her, C.O. told him to stop, attempted to avoid his kisses, and yelled out several times for help.

After this violent encounter, Young got up from the bed and fixed his clothes. Young began to walk upstairs but then turned and told C.O. that if she told anyone what had just happened he would hurt her kids or her family. Once Young was upstairs, C.O. heard A.W. yell. C.O. became concerned for A.W.'s safety, so she ran upstairs to check on her.

When C.O. arrived in A.W.'s room, she found Young on top of A.W. Young appeared to be wrestling A.W., trying to get her keys from her. When she refused to give him her keys Young held A.W. down and attempted to take her shorts off. A.W. attempted to push Young off and yelled for help from C.O. C.O. helped A.W. get Young off her. Young finally stopped and went back down to the basement to look for his cigarettes.

Approximately 10 minutes later, C.O.'s father, Randy, arrived at the house. At that point, C.O. was crying so hard that she was unable to talk to him. All Randy could get from either woman was that they wanted Young to leave but he would not. Randy went

downstairs and told Young to leave. Randy then returned to A.W.'s room and called the police after learning C.O. had been raped.

Young's version of the events differed significantly from C.O. and A.W. He claimed that while in the basement, C.O. grabbed him by the shirt, pulled him onto the bed on top of her, and started kissing him. According to Young, he and C.O. were in bed engaging in consensual sex for 15 or 20 minutes. When they were finished they remained in bed talking for a few minutes. C.O. then got up, got dressed, and went upstairs.

According, to Young, C.O. returned to the basement, told Young that A.W. was angry with him for spilling his drink in her truck earlier that day, and suggested Young go apologize. The two of them went back upstairs to A.W.'s room. Young asked A.W. for the keys to her truck so that he could go out and clean up his mess. A.W. refused several times, so Young left her room and went back downstairs.

When Young got downstairs C.O. was crying. Young claimed that C.O. was upset because she believed Young was hitting on A.W. After Young explained that he was not interested in A.W., C.O. went back upstairs. Young remained in the basement to look for his cigarettes. Several minutes later Randy came down the stairs looking for C.O. When Young told him C.O. was upstairs, Randy went upstairs to find her. Randy came back down less than a minute later and asked Young to leave. Young complied.

Officer Nathan Houston responded to the call from Randy. After learning from Randy that C.O. had been raped, Houston contacted dispatch and asked for back up. Police Chief Doug Murphy arrived soon after to assist Houston with the investigation. Houston, Murphy, and Randy were standing outside on the front porch discussing the assault when Randy saw a truck drive past the house that he identified as Young's. The officers left the house and conducted a traffic stop of the vehicle. After Young was arrested, Houston returned to A.W. and C.O.'s home to attempt to interview the women.

3

Houston was able to interview A.W., but C.O. was still hysterical so he was unable to interview her. At that time, Houston also made arrangements for C.O. to go to a hospital in Wichita for a sexual assault evaluation.

Tina Peck was the SANE/SART nurse who performed the sexual assault examination of C.O. During the examination C.O. was in moderate distress, meaning she was extremely tearful and the examination had to stop several times so that C.O. could collect her composure. At the time of her examination, C.O. complained of physical pain in her lower abdomen and vagina that C.O. ranked as severity level 7 on a scale of 1 to 10. Peck performed a physical examination of C.O. and found multiple lacerations and abrasions around C.O.'s vagina, one of which she described as uncommonly large. She described that lacerations are caused by blunt force. Peck was able to take swabs from C.O.'s vagina and vaginal area to check for the presence of foreign DNA but was unable to perform an internal investigation with a speculum because C.O. was in too much pain. It was later determined through forensic analysis that the vaginal swabs revealed the presence of sperm belonging to Young in C.O.'s vagina.

Meanwhile, back at the scene, Young remained in Murphy's custody while the two waited for an additional officer to arrive to transport Young to the jail. Murphy read Young his *Miranda* rights. Young said he understood his rights and was willing to go ahead and talk to Murphy at that time. Murphy informed Young of the allegations against him. Young admitted that he had sex with C.O. but contended that the encounter was consensual. Murphy asked Young if he had used a condom. At that point Young requested an attorney, and Murphy ceased his questioning.

After questioning had ceased, Deputy Sheriff Chad Hacker arrived to transport Young to jail. Young was transferred from Houston's car where he had been waiting with Murphy, to Hacker's truck. On the drive to the jail, Young asked Hacker questions about the charges against him. Young asked: "who he had raped"; "how somebody could be

4

raped when there wasn't any penetration"; whether "it was [A.W.] that said she had been raped"; and, "how he would be charged with rape when he never had sex with anyone." During the drive to the jail, Young specifically referenced A.W. but did not discuss C.O.

Several months later, while Young was in jail awaiting trial, Young's friend allegedly offered C.O. money not to testify, which gave rise to the intimidation of a witness charge.

Prior to trial, at the request of the State, a *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), hearing was held to determine whether Young's statements to Murphy and Hacker were admissible. After a hearing, the trial court determined that Young's statements to both Murphy and Hacker were made knowingly and voluntarily and thus were admissible at trial. At trial, the district court admitted Hacker's testimony regarding the statements Young made to him over the objection of the defense.

Later in the trial, Young sought leave to call Murphy as a witness to testify about the statements Young made to him after his arrest. The State argued against allowing the testimony, citing *State v. Stano*, 284 Kan. 126, 159 P.3d 931 (2007). The district court agreed that *Stano* controlled and ruled that Murphy could not be called by the defense to testify to Young's exculpatory statements in lieu of his own testimony.

Young was the only witness called by the defense.

The jury found Young guilty of rape but acquitted him of the attempted rape of A.W. and aggravated intimidation of a victim. Young filed a timely appeal.

5

Young first argues that he was deprived of a fair trial and that both his constitutional right to present a defense and his constitutional right against self-incrimination were violated when the district court refused to allow him to call Murphy to the stand and examine him about exculpatory statements Young made to Murphy while in his custody. So we begin by examining the statements Young sought to admit and the context which he asserts makes them admissible.

*The factual context of the exculpatory statements are examined.*

Young told Murphy that C.O. and A.W. were flirting with him, that he had consensual sex with C.O., and that he did not have sex A.W. When asked by Murphy if he had any physical contact with A.W. he said he had no contact of any kind with A.W. Young sought to introduce his conversation with Murphy *in lieu* of testifying. He asserts that these exculpatory statements were admissible because the State was allowed to introduce inculpatory statements Young made to the transport officer, Hacker, subsequent to the statements he made to Murphy. The State had already introduced testimony that that during transport, Young asked Hacker if it was A.W. who said she was raped. When Hacker said he didn't know who was making the allegations, Young responded that he didn't know how he could rape someone when he didn't have sex with "anyone." Young argues that because he was still referring to A.W. with regards to the person he did not have sex with, it was important for the jury to hear the conversation with Murphy where he admitted sex with C.O., portrayed it as consensual, and denied contact with A.W. To allow one, but not the other, prevented him from fully presenting his defense and forced him to incriminate himself by testifying. It also left a false impression with the jury that he was denying he had sex with anyone, when the DNA evidence clearly established he had sex with C.O.

*The relevance of the excluded testimony is not challenged.*

This court reviews a challenge to a district court's decision to exclude evidence using a multistep analysis. *State v. Bridges*, 297 Kan. 989, 995, 306 P.3d 244 (2013). First, we must determine whether the challenged evidence was relevant. 297 Kan. at 995. The parties do not dispute that the conversation between Murphy and Young was relevant, so we move on to the next step of the analysis.

*The district court correctly determined that* Stano *guides the analysis in this case.*

Next, this court reviews the district court's choice of rule or guiding legal principle de novo. *Bridges*, 297 Kan. at 996. Here, the district court found that *Stano*, 284 Kan. at 137, was the guiding legal principle. In *Stano*, the defendant challenged the district court's exclusion of exculpatory statements he made to a police detective as hearsay. Although Stano acknowledged that the statements were hearsay, he argued that they should have been admitted after inculpatory hearsay statements he made to other witnesses were admitted. Stano contended that the admission of only inculpatory hearsay statements denied him a fair trial and violated his constitutional right to due process. See 284 Kan. at 130-31.

Our Supreme Court acknowledged that there are situations in which the hearsay rule must yield to the interests of justice, but these situations are limited. 284 Kan. at 137. One situation in which justice requires admission of otherwise inadmissible hearsay is when inculpatory portions of a statement or conversation are admitted while the exculpatory portions of the same statement or conversation are excluded. 284 Kan. at 137. In such situations, the jury receives a "distortion of the whole truth of a statement or conversation, and a trial court should therefore act to eliminate such unfairness." 284 Kan. at 137.

7

In *Stano*, our Supreme Court found that the continuous statement exception did not apply because Stano's inculpatory and exculpatory statements were made at different times to different people. 284 Kan. at 137. The court reasoned that Stano's request for admission was simply an attempt "to offer the exculpatory hearsay statements . . . into evidence without allowing the State an opportunity to cross-examine [him] with regard to those statements." 284 Kan. at 137. Under the circumstances, the court found that the traditional rule that "a defendant's 'unverified, uncross-examined, self-serving statements to the police' are inadmissible" applied. 284 Kan. at 137. In sum, the court found that Stano's constitutional right to a fair trial was not implicated. We find that the district court correctly determined that *Stano* guides the analysis in this case.

*We apply the rule in* Stano *to the facts of this case.*

Having determined that the district court applied the correct legal principle, it is necessary for this court to review the district court's application of the rule. *Bridges*, 297 Kan. at 996. Generally, a district court's admission or exclusion of hearsay evidence is reviewed for an abuse of discretion. *Stano*, 284 Kan. at 131.

Young attempts to distinguish his factual situation from that in *Stano*, arguing that the statements he made to Murphy and Hacker were so close in time and were so factually intertwined that they ought to have been considered one continuous statement for the purpose of admitting them. Young argues this is necessary because the question he asked Hacker regarding how he could be charged with rape when "he never had sex with anyone" must be considered in the context of his recent admission to Murphy that he had consensual sex with C.O. Under these circumstances, Young argues, the statement to Hacker was an attempt to convey that Young did not rape A.W., not an attempt to conceal the fact that he had sex with C.O.

8

In support of his argument, Young relies primarily on three cases: *State v. Hills*, 264 Kan. 437, 957 P.2d 496 (1998), *State v. Rakestraw*, 255 Kan. 35, 871 P.2d 1274 (1994), and *State v. Brickhouse*, 20 Kan. App. 2d 495, 890 P.2d 353, *rev. denied* 257 Kan. 1093 (1995). In *Hills* and *Rakestraw*, the Kansas Supreme Court determined that the district courts erred when they admitted inculpatory portions of defendants' out-of-court statements to police while excluding exculpatory portions because the redaction of the statements so distorted their meaning that the defendants were denied fair trials. See *Hills*, 264 Kan. at 447-48; *Rakestraw*, 255 Kan. at 45-46. *Hills* and *Rakestraw* are easily distinguished from the facts of this case. In both, the district court essentially redacted exculpatory portions of a single statement, made to a single person, while admitting inculpatory portions of the same continuous statement. As a result, the integrity of the original statements were compromised so that they no longer reflected the statements the defendants actually made.

In *Brickhouse*, the facts were slightly different—the district court admitted inculpatory hearsay evidence from an unavailable witness but failed to admit a contradictory, exculpatory statement from the same witness. The ultimate holding, however, was the same—this court determined that inconsistent application of the hearsay rule to admit inculpatory evidence while excluding exculpatory evidence had the impact of denying the defendant a fair trial. 20 Kan. App. 2d at 502. Like the statements here, those in dispute in *Brickhouse* were two separate statements. However, the facts in *Brickhouse* differed from the case at bar in at least one significant way—the hearsay statements Brickhouse sought to admit were made by a third party. This is significant because the district court's failure to admit the exculpatory statement, combined with the witness' unavailability, meant that Brickhouse had no way to present the exculpatory statement to the jury or to challenge the reliability of the inculpatory statement through cross-examination. Thus, the jury was left with an incomplete picture of the statements the witness made to police which Brickhouse was unable to correct. Here, the excluded hearsay statements were made by Young. Young had the opportunity to provide context

9

to Hacker's trial testimony by taking the stand himself. See *State v. King*, 221 Kan. 69, 72, 557 P.2d 1262 (1976) ("'where a party seeks to use out-of-court statements in a self-serving manner, in lieu of placing the declarant on the stand to testify, trial judges should ordinarily sustain objection under the broad discretionary authority to require the best evidence'").

In reaching its decision, the *Stano* court revisited and reaffirmed the holding of *Hills*, that it is impermissible "'to admit an incriminating hearsay statement by the defendant while denying the admission of the exculpatory portions of the same hearsay statement through the use of the hearsay rule.'" *Stano*, 284 Kan. at 135.

The *Stano* court similarly considered *Brickhouse*'s holding that "'admitting hearsay evidence from an absent witness that is incriminating while denying admission of hearsay evidence from that same witness that is exculpatory is so unfair as to amount to a denial of due process'" when the exculpatory evidence is "'not available through the testimony of other witnesses.'" 284 Kan. at 136. The court went on to clarify that these holdings are limited in their application: *Hills* to situations in which the excluded exculpatory statement is made in the same interview or written statement as the inculpatory statement; and, *Brickhouse* to situations where a district court admits "only the incriminating statements made by a [unavailable] witness to the police when the witness also made exculpatory statements to the police." *Stano*, 284 Kan. at 136-37.

Ultimately, the *Stano* court determined that the facts of Stano's situation did not fall under either the *Hills* or *Brickhouse* hearsay exceptions because his inculpatory and exculpatory statements were made to different people at different times. *Stano*, 284 Kan. at 137. Because the statements were distinct, the State's admission of the inculpatory hearsay did not compel the court to admit the exculpatory hearsay at the defendant's request. 284 Kan. at 137.

10

While the statements at issue in this case are not as clearly distinct as those in *Stano*, Young's attempt to argue that his conversations with Murphy and Hacker should be considered one continuous statement is not persuasive. Young spoke to Murphy immediately after his arrest in Officer Houston's patrol car while the two waited for an additional officer to arrive to transport Young to jail. After a few minutes of answering Murphy's questions, Young invoked his *Miranda* rights. Conversation related to the crimes charged then ceased as Murphy and Young continued to wait for transportation. Hacker then arrived on the scene, transferred Young to his patrol car and began to drive him to jail. Young then began talking again, asking questions about the crimes he was being accused of committing. The statements Young made to Murphy were in response to an interrogation. The statements Young made to Hacker were voluntary, made after Young had invoked his *Miranda* rights. In addition to the nature of the statements being different, the statements were made at different times to different people. Moreover, defense counsel, in his cross-examination of Hacker, made it clear to the jury that although Young stated he did not have sex with "anyone" he was only talking about A.W.

Unconditional admission of a defendant's exculpatory hearsay statements, made separately from any other admitted hearsay, is not and never has been a constitutional requirement of a fair trial. Because Young's exculpatory statements were made in a conversation that was distinct from the conversation in which he made inculpatory statements, the district court properly employed the hearsay rule to exclude Young's statement to Murphy in lieu of Young testifying about it. The exclusion of this evidence did not violate Young's constitutional rights, and the district court did not abuse its discretion when it failed to admit the statements. There is no indication that the district court would have prohibited Young from calling Murphy to the stand after Young testified in order to corroborate Young's testimony that he had consensual sex with C.O. There is no indication in the record that Young made any attempt to do so.

Young next identifies 12 separate incidents during the State's closing argument in this case that he believes rise to the level of prosecutorial misconduct and resulted in reversible error.

*Our standard of review is examined.*

Appellate review of allegations of prosecutorial misconduct involving improper comments to a jury during closing arguments requires a two-step analysis. First, this court determines whether the prosecutor's comments were outside the wide latitude the prosecutor is allowed in discussing the evidence. *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014). If misconduct is found, this court must go on to the second step in which it determines whether the improper comments compel reversal; that is, whether the statements prejudiced the jury against the defendant so that the defendant was denied a fair trial. 299 Kan. at 416.

In the second step of the analysis, this court considers three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). None of these three factors is individually controlling. 299 Kan. at 540. Before the third factor can override the first two factors, this court must be able to say that the harmless error test of *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), has been met. *Armstrong*, 299 Kan. at 417. Under this test, the party benefitting from the alleged prosecutorial misconduct must prove "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the

12

verdict.'" 299 Kan. at 417. It is rare that a prosecutor's comments, even when deemed misconduct, will be found to be so prejudicial that it is necessary to reverse and remand the case for a new trial. See *State v. Pabst*, 268 Kan. 501, 502, 996 P.2d 321 (2000).

*We analyze error that occurred in the prosecutor's closing statement.*

We have fully reviewed all 12 allegations of error including the full context of the argument made. Some claims of error are irrelevant because they relate to charges for which Young was acquitted. We find three claims of error merit further review in light of the arguments made by the parties. All other alleged errors were fair comments on the evidence and adequately supported in the record and do not warrant further discussion. Of the three we do review here, we will first list the statement in its full context and then analyze whether it was reversible prosecutorial error.

I.

"[Young] denied having sex with anyone to Chad Hacker and yet we know he did have sex with C.O. He raped her. The DNA shows it, but at that time he didn't know there would be DNA that would show up in her vagina, his DNA."

Young argues that this statement constituted misconduct because his comments to Hacker strictly applied to A.W., a fact the jury was unable to know because the district court refused to admit Murphy's testimony regarding the statements Young made to him—his admission that he had consensual sex with C.O. Young uses this as an opportunity to continue his discussion of the inculpatory/exculpatory argument in the first appellate issue discussed above. Defense counsel argued in closing—just as he pointed out at trial—that Young's statements to Hacker were meant only to apply to A.W. He argued that Young never asked about C.O. because Young knew he didn't rape her—they had consensual sex.

13

Hacker's testimony was that Young asked him "how he could rape somebody when he never had sex with them." Hacker testified on cross-examination that A.W.'s name was the only name Young mentioned to him. However, Hacker also reiterated that Young's statement to him was not that Young had not had sex with A.W., but that he had not had sex with anyone. Young testified that he had consensual sex with C.O. Young seems to lose sight of the fact that he could have subsequently called Murphy to corroborate his claim that he always asserted that he had consensual sex with C.O. but did not. The district court was only asked to rule whether Young could call Murphy in lieu of testifying himself.

The prosecutor's claim that, when talking to Hacker, Young denied having sex with anyone is accurate, as is the statement that his DNA was found in C.O.'s vagina. The inference from these facts that Young raped C.O. then tried to deny his culpability when speaking to Hacker was a reasonable inference based on the evidence. This was not misconduct. The jury, as the finder of fact, had both arguments presented to it, and jurors could determine for themselves what they thought Young meant by his comments to Hacker.

## II.

"I understand, nobody wants to believe that rape exists in our culture. I get that.

. . . .

"Or if it does, that's a big city—that's a third world problem, a big city, that's a Middle East problem. They rape women. We don't do it here in this country. Or maybe we think that's a big city problem. That's not a Harper County problem. Well, you guys were here for jury selection. You heard about the number of women who indicated that either they, a friend, or a loved—or a relative had been the victim of sexual assault, so we know that's not true, either. And maybe you want to believe that all rape is done by a stranger or some creepy guy in a panel van. And that it wouldn't happen in Harper County and on Main Street, no less, in the daylight and with a regular-looking guy, no

14

less. We don't want to believe that it can happen, but it does, ladies and gentlemen and the evidence suggests here that it happened beyond a reasonable doubt."

Young argues that this statement was improper for two reasons. First, it was an attempt by the State to incorporate "untested, unconfrontable representations by the jury panel." He argues that comments made to the jury panel "bear no relevance to the defendant's guilt or innocence, cannot be relied upon by the jury in deliberations, and should not be argued by the State." Second, he argues that this argument was a "digression into the prevalence of sexual assault" and as such, "diverted the jury's attention from the facts and injected an emotional issue irrelevant to Young's guilt or innocence."

Young is correct that only evidence admitted at trial can be used by the jury in reaching its decision, and the prosecutor should not try to use closing argument as an opportunity to present new evidence to the jury. That, however, is not what the prosecutor was doing here. The prosecutor was simply acknowledging the prevalence of sexual assault in the world, something that is within their common knowledge. As our court stated in *State v. Henderson*, 32 Kan. App. 2d 1202, 1209-10, 96 P.3d 680 (2004):

> "In seeking out members of the community for jury service, the courts do not limit the search to inhabitants of monasteries or nunneries or others who live a cloistered life. An important attribute of a jury is the collective common knowledge and wisdom it possesses from the varied experiences of its members during their many years on this earth. Matters within the common knowledge of mankind are a proper subject for comment during the summation."

Because it is permissible for a prosecutor to discuss facts that are within the common knowledge of the jury, this would certainly include the occurrence of crimes of sexual assault in the world or in their community.

15

Second, Young suggests that the prosecutor sought to inflame the passions of the jury. It is well established that "jurors 'must decide a case on evidence and controlling law, and not on sympathy, emotion, or prejudice.' [Citation omitted.] Therefore, '"[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence . . . ." [Citation omitted.]'" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014).

The statement at issue here could be viewed as inflammatory. It placed Young in the same category as a person from the Middle East, where "[t]hey rape women," or a "creepy guy in a panel van." It comes very close to asking the jury to bring justice to the community or to protect the community from such wrongdoers. A majority of this panel believes that the statement was a clear attempt to appeal to and inflame the passions of the jurors. In today's political environment comparing someone to a Middle Eastern rapist appeals to the jurors prejudices and passions. The minority believes that the prosecutor simply sought to have the jury recognize that while rape is ugly, it happens, even in close-knit communities such as Harper County. The prosecutor was implying that the jurors should not enter a finding of not guilty simply because it is hard to believe such an act would happen in their community. But regardless of whether the statement did constitute misconduct, we all agree that given all the evidence in the case, the comment was harmless. In other words, there is no reasonable possibility that the error contributed to the verdict. *Williams*, 299 Kan. at 417. There is no dispute that Young and C.O. were involved in a sexual encounter, and both C.O.'s reactions after the encounter and the confirmation by the SANE/SART nurse that C.O.'s numerous vaginal injuries were caused by blunt force trauma, provide overwhelming evidence for the jury to conclude that the encounter was actually a violent rape and not consensual sex, regardless of the comparisons made to other unsavory characters.

16

III.

"[DEFENSE COUNSEL:] . . . [Let] me leave you with something that [C.O.] testified to . . . . And what was the question? Had to do with her shorts. And what was her answer? When me and Reese got done, whatever.

"Now does that sound like the statement from someone who has been raped?

. . . .

"[PROSECUTOR:] . . . [O]kay, we can take pots shots at [C.O.] when she took the stand today. Okay. She didn't cry enough or maybe she cried too much, who knows. But one thing that every witness testified to was that night, June 24, 2013, [C.O.] was inconsolable. She couldn't even talk to her dad. She was so inconsolable, the deputies said I didn't even try to talk to her. My training tells me not to. [A.W.] said it, [Randy] said it, the officers said it. Even by the time she got to the hospital, the SANE/SART said she had to stop a few times and provide support because [C.O.] was crying.

"That is how a rape victim acts. Is that something that can be faked? If [C.O.] had that kind of talent to fake that emotion that night? I submit to you she does not."

It is well established that prosecutors may neither attempt to bolster the credibility of their own witnesses by giving personal endorsements of their veracity nor attack the credibility of opposing witnesses with disparaging remarks indicating the prosecutor's belief that the witnesses were untruthful. *State v. Elnicki*, 279 Kan. 47, 60, 105 P.3d 1222 (2005). Moreover, "a prosecutor commits misconduct by making an improper argument, even if the improper argument is made in response to arguments or statements by defense counsel. The open-the-door rule does not insulate a prosecutor from a finding of misconduct." *State v. Marshall*, 294 Kan. 850, 860, 281 P.3d 1112 (2012). But the extemporaneous, rebuttal nature of a prosecutor's argument is *a* factor to be considered by an appellate court. 294 Kan. at 861.

Young argues that this statement constituted the State vouching for the credibility of C.O. Clearly, the prosecutor's statements were made in direct response to the defense suggestion that C.O. had not acted like a rape victim would act. The prosecutor then

17

pointed to other behaviors by C.O. that would suggest she had been involved in a traumatic event and questioned whether someone could fake the extreme emotion she demonstrated the night of the attack. He was not stating that as a matter of scientific fact rape victims always act like C.O. acted. Similar actions by prosecutors have clearly been disapproved and found to be error. See *State v. Chanthaseng*, 293 Kan. 140, 147, 261 P.3d 889 (2011) (prosecutor commenting on common experience of delayed or piecemeal disclosures by child abuse victims indicating their trustworthiness which the court described as "cynical manipulation toward a pseudo-scientific conclusion from limited, subjectively reported anecdotes of their peers"); *State v. Simmons*, 292 Kan. 406, 414-15, 254 P.3d 97 (2011) (prosecutor commenting on Stockholm Syndrome as it relates to kidnap victims even though no evidence was presented on syndrome). Instead the prosecutor here was commenting directly on evidence within a juror's common knowledge that would suggest C.O. was traumatized that evening. Because the challenged statement is preceded by a discussion of the evidence, it was a proper comment detailing how the evidence supported C.O.'s testimony. See *Chanthaseng*, 293 Kan. at 148 (prosecutor may offer the jury an explanation of what it should look for in assessing witness credibility). Accordingly, we find this was not misconduct.

CUMULATIVE ERROR

Young argues that in addition to the improper exclusion of his exculpatory hearsay statements, the numerous instances of prosecutorial misconduct during closing arguments coalesced to deny him a fair trial. He argues that "[c]onsidered in the aggregate, these errors substantially and prejudicially incapacitated the defense, depriving Young of a fair trial." The difficulty with Young's position is that he has only successfully established one error, the prosecutor's reference to the Middle East and creepy panel van drivers, and we deemed that error harmless. "Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

18

Affirmed.